## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| Angelo Lee Clark, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 17-cv-00066-RGA |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| Robert M. Coupe, Perry Phelps, Dana Metzger, | ) | |
| David Pierce, Major Jeffrey Carrothers, Captain | ) | |
| Burton, Captain Rispoli, Captain Willy, Dr. | ) | |
| William Ray Lynch, Dr. Paola Muñoz, Dr. David | ) | |
| Yunis, Rhonda Montgomery, Susan Mumford, | ) | |
| Stephanie D. Johnson, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

### NATURE OF ACTION

1.     This action seeks damages and injunctive relief for the cruel and unusual punishment of Plaintiff Angelo Lee Clark ("Clark") in Delaware prisons.  Mr. Clark has been diagnosed with serious mental illness ("SMI"), including manic depression and paranoid schizophrenia.  The Defendants frequently confined Clark in solitary confinement with no due process in retaliation for Mr. Clark's SMI, loud voice, or minor rule infractions, without providing proper medical and mental health treatment for serious medical and mental health needs.  In so doing, Defendants intentionally or with deliberate indifference inflicted cruel and unusual punishment on Mr. Clark, denied him minimum appropriate care, and significantly exacerbated his SMI.

2.     Defendants' conduct violates Mr. Clark's rights under the First, Fifth, and Eighth Amendment of the United States Constitution, as applied through the Due Process Clause of the Fourteenth Amendment.

3.      Defendants operate the James T. Vaughn Correctional Center ("JTVCC").

4.      On information and belief, during the past few years at JTVCC's Secure Housing Unit ("SHU"), approximately 300 prisoners with serious mental illnesses ("SMI"), including Mr. Clark, were locked in extremely small cells 24 hours a day and only permitted outside their cell for one hour every other day.  Mr. Clark and the other SMI prisoners in the SHU are completely isolated, denied adequate medical and mental health care, and prohibited from working, participating in educational or rehabilitative programs, or attending religious services.

5.      Defendants are well-aware of Mr. Clark's serious mental illness.  He has been treated for schizophrenia and bipolar disorder while incarcerated in DOC facilities since at least 2006, if not earlier.

6.      Defendants were aware that, because Mr. Clark was seriously mentally ill, placing him in solitary confinement and denying him proper mental health treatment would cause Mr. Clark to be severely and adversely affected.  Defendants intentionally caused, or were deliberately indifferent to the substantial risk of, serious harm to Mr. Clark from their conduct.

7.      Defendants' practice of housing Mr. Clark in the SHU as a substitute for mental health treatment inflicted severe mental and emotional distress and exacerbated Mr. Clark's serious mental illness by depriving him of the opportunity to engage in normal human interaction, such as talking with or seeing others, working, participating in educational or rehabilitative programs, or attending religious services, which promote mental health and wellbeing.

8.      The doors of the cells where Mr. Clark was held in solitary confinement are essentially solid, with a single, 4-inch-wide window.  Correctional officers deliver meals to prisoners by sliding the food through slots in the doors that are opened briefly for that purpose.

2

Lights are on for all but approximately six hours per day, and few visitors or phone calls are permitted.

9.     While Mr. Clark was in the SHU, Defendants deprived Mr. Clark of any meaningful mental health treatment and given medications mental health staff knew caused serious allergic reactions and increased hallucinations.  He was treated infrequently by a mental health provider, going weeks and months without any meaningful interaction with a medical health provider, and he had no mental health counselling.

10.     According to Keramet Reiter, a University of California Irvine professor and expert on solitary confinement, there is a growing body of data that these types of conditions cause psychological harm and even brain shrinkage.  Hallucinations, panic attacks, paranoia and nightmares are all commonly reported, says Reiter.  Reiter's research shows that there can be an impact within only a few days, and that 15 days is the "outer bounds" of what is tolerable.

11.     Mr. Clark was housed in solitary confinement at JTVCC for a period of *7 months* from January–August 2016.  He was previously housed in solitary confinement at JTVCC for a period of 15 days in 2015.  He was also housed in solitary confinement at JTVCC for a period of nearly six months in 2012, and for various other lengthy intervals prior to that.

12.     As a result of consistently being housed for long periods of time in the SHU, Mr. Clark experienced increased hallucinations, paranoia, self-mutilation, sleeplessness, and nightmares.  Prison officials frequently regarded these manifestations of disease as prison rule infractions, which resulted in additional time in solitary confinement and further limitations on privileges, such as reduced phone time and visitation privileges.

13. The result was a vicious cycle in which Mr. Clark, because of his mental illness, was trapped in a sequence of isolation and punishment, resulting in further deterioration of his mental condition and deprivation of adequate mental health treatment.

14. Defendants used solitary confinement in the SHU as a substitute for providing Mr. Clark with proper mental healthcare, and Defendants failed to take other reasonable measures to ameliorate the risk of serious harm to Mr. Clark. Defendants had knowledge of the risks these deficiencies pose to Mr. Clark's mental illness. Nevertheless, they permitted them to continue.

15. Plaintiff seeks a declaration that Defendants are violating the Eighth Amendment of the U.S. Constitution, a permanent injunction requiring Defendants to cease violating the Eighth Amendment rights and Article I, Section 11 rights of Mr. Clark and to protect him against dangerous and unconstitutional conditions of confinement. Plaintiff also seeks damages.

## JURISDICTION AND VENUE

16. This Court has jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1343.

17. Plaintiff's claims are authorized by 42 U.S.C. § 1983, 42 U.S.C. §§ 10801 *et seq.*, and 28 U.S.C. §§ 2201 and 2202.

18. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b) because Plaintiff's residence, Defendants, and Defendants' principal offices are located in this District, and all claims alleged occurred in this District.

## THE PARTIES

19. Mr. Clark is a citizen of the United States and the State of Delaware, and at all times relevant to the events described in the First Amended Complaint ("FAC"), has been in the custody of the DOC. Mr. Clark has been in the custody of DOC since 2004.

4

20.     Defendant, Robert M. Coupe ("Coupe"), was the Commissioner of the Delaware Department of Correction until January 2017, and a state actor for purposes of the Fourteenth Amendment.

21.     Defendant Perry Phelps ("Phelps") is the Commissioner of the Delaware Department of Correction and a state actor for purposes of the Fourteenth Amendment.

22.     Defendant Dana Metzger ("Metzger") is Warden of James T. Vaughan Correctional Center and a state actor for purposes of the Fourteenth Amendment.

23.     Defendant David Pierce ("Pierce") was Warden of James T. Vaughan Correctional Center until February 2017, and a state actor for purposes of the Fourteenth Amendment.

24.     Defendant Major Carouthers ("Carouthers") at all times relevant to this First Amended Complaint was employed at JTVCC and a state actor for purposes of the Fourteenth Amendment.

25.     Defendant Captain Burton ("Burton") at all times relevant to this First Amended Complaint was employed at JTVCC and a state actor for purposes of the Fourteenth Amendment.

26.     Defendant Captain Rispoli ("Rispoli") at all times relevant to this First Amended Complaint was employed at JTVCC and a state actor for purposes of the Fourteenth Amendment.

27.     Defendant Captain Willy ("Willy") at all times relevant to this First Amended Complaint was employed at JTVCC and a state actor for purposes of the Fourteenth Amendment.

28.     Defendant Dr. Edward "Ray" Lynch ("Lynch") is head of medical services at James T. Vaughan Correctional Center and a state actor for purposes of the Fourteenth Amendment.

29.     Defendant Dr. Paola Muñoz ("Muñoz") is a psychologist who provides medical care to inmates at Warden of James T. Vaughan Correctional Center and a state actor for purposes of the Fourteenth Amendment.

30.     Defendant Dr. David Yunis ("Yunis") is a psychiatrist who provides medical care to inmates at Warden of James T. Vaughan Correctional Center and a state actor for purposes of the Fourteenth Amendment

31.     Defendant Rhonda Montgomery ("Montgomery") is a nurse practitioner who provides medical care to inmates at James T. Vaughan Correctional Center and a state actor for purposes of the Fourteenth Amendment.

32.     Defendant Susan Mumford ("Mumford") is a nurse practitioner who provides medical care to inmates at James T. Vaughan Correctional Center and a state actor for purposes of the Fourteenth Amendment.

33.     Defendant Stephanie D. Johnson ("Johnson") is a nurse practitioner who provides medical care to inmates at James T. Vaughan Correctional Center and a state actor for purposes of the Fourteenth Amendment.

34.     Coupe, Phelps, Pierce, Metzger, Carouthers, Burton, Risploi, and Willy are collectively referred to herein as the "DOC defendants."

35.     Lynch, Muñoz, Yunis, Montgomery, Mumford, and Johnson are collectively referred to herein as the "Medical Provider defendants."

36.     Defendants are responsible for correcting and compensating Plaintiff for the constitutional violations described in this FAC.

## FACTS

### A.  In Solitary Confinement, Mr. Clark Was Subjected To Extreme Isolation And Grossly Inadequate Mental Healthcare.

37.     Although Defendants are responsible for the health and wellbeing of a significant number of prisoners with mental health issues, they failed to provide meaningful mental health treatment to Mr. Clark, and instead isolated him in solitary confinement in conditions of extreme social isolation and environmental deprivation in retaliation for his SMI, speaking in a loud voice, or possible minor infractions.  This continued isolation and deprivation of medical treatment exacerbated Mr. Clark's mental health illness, inflicted severe emotional and mental distress, worsened his physical health, and caused physical injury, including fear, insomnia, anxiety, depression, increased mood swings and hallucination, and self-mutilation.

38.     Mr. Clark was kept in the SHU alone, in a small cell for 24 hours a day, except for one hour three times per week.

39.     SHU cells are approximately 11' x 8'.  They have two four-inch-wide windows, one of which allows a very constricted view of the hall outside the cell and no other view.  The other allows a narrow glimpse outdoors, which lets in little, if any, natural light.  The cells contain a sink, a toilet, and little furniture.  Prisoners are not able to control the lights, which remain lit from approximately 6:00 a.m. through 11:30 p.m., which made it difficult for Mr. Clark to sleep and further contributed to his disorientation and mental deterioration.

40.     No prisoner in solitary confinement is permitted more than four telephone calls and four visits per month.

41.     While in the SHU, Mr. Clark had no access to therapy sessions or counselling, and he only saw a mental health provider who evaluated his medications once every few months.

42.     Mr. Clark, like others with serious mental illness, needs psychosocial rehabilitation services, such as frequent individual and group therapy sessions, and structured out-of-cell activities designed to decrease isolation, increase social interaction, increase treatment and medication compliance, and decrease psychiatric symptoms.  These services were not provided to Mr. Clark in solitary confinement.

43.     The prevalence of suicide and self-harm in solitary confinement is pronounced.  It is not unusual for prisoners with serious mental illness in solitary confinement to swallow razors, smash their heads into walls, compulsively cut their flesh, or try to hang themselves.

44.     The devastating effects of conditions of extreme social isolation and environmental deprivation like those in Delaware's solitary confinement units are well known to Defendants.  The NCCHC *Standards for Mental Health Services in Correction Facilities*, published in 2008, directs that "[i]nmates who are seriously ill should not be confined under conditions of extreme isolation."  The NCCHC further notes that:

> Even those without a prior history of mental illness may experience a deterioration in mental health, experiencing anxiety, depression, anger, diminished impulse control, paranoia, visual and auditory hallucinations, cognitive disturbances, obsessive thoughts, paranoia, hypersensitivity to stimuli, posttraumautic stress disorder, self-harm, suicide, and/or psychosis. Some of these effects may persist after release from solitary confinement. Moreover, the very nature of prolonged social isolation is antithetical to the goals of rehabilitation and social integration.

45.     Similarly, the American Psychiatric Association's ("APA") *Position Statement on Segregation of Prisoners with Mental Illness* ("Position Statement") finds that prolonged segregation should be avoided for prisoners with serious mental illness due to the potential for harm to such prisoners.  The APA Position Statement further states that if prisoners with serious

mental illnesses are placed in isolation, appropriate clinical supports and out-of-cell time must be provided.

46.     Defendants' actions caused and continue to cause Mr. Clark severe emotional and mental distress and physical injury, as noted above.

**B.  Defendants' Policies And Practices Inflicted Severe Harm On Mr. Clark**

(i)     <u>Defendants deliberately placed Mr. Clark in solitary confinement rather than treating his mental illness.</u>

47.     Defendants failed to take reasonable action to prevent Mr. Clark from being placed in solitary confinement and did not properly evaluate him before such placement.

48.     In 2012, Defendants placed Mr. Clark in the SHU for at least six consecutive weeks because of his mental illness.

49.     In 2015, Defendants placed Mr. Clark in the SHU for at least two consecutive weeks because of his mental illness.

50.     Most recently, Defendants placed Mr. Clark in the SHU on or around January 22, 2016, following an incident at meal time where a younger inmate punched Mr. Clark in his pacemaker.  The other inmate was put back in his cell, but Mr. Clark was put in the SHU for the next ***seven months***, until on or around August 18, 2016.

51.     In January 2016, when he was placed in the SHU, Mr. Clark had low "points" because he had good prior conduct and had no security classification meriting confinement in the SHU, let alone seven months in solitary confinement.

52.     The warden has the power to control and veto any decision on status, including housing status, for an inmate.  The DOC Commissioner controls overall policy and management

of the prison, including the practice of housing Mr. Clark in the SHU in response to and retaliation for using a loud voice, minor infractions, and manifestations of his mental illness.

53.     The DOC Defendants would frequently sanction Mr. Clark merely for talking in a loud voice, regardless of the content of his speech or his intent, and with knowledge that Mr. Clarks has a hearing problem.

54.     Prior to placing Mr. Clark in the SHU, Defendants engaged in no due process or any procedure giving Mr. Clark an opportunity to be heard or consult with counsel.

55.     Rather than providing such due process or providing appropriate mental health treatment to Mr. Clark, Defendants retaliated against Mr. Clark and placed him in the SHU. Defendants failed to provide any evaluation, counselling, or mental health care while Mr. Clark was in the SHU, and continued to retaliate against him due to his mental illness and requests for due process while he was in the SHU.

56.     While in the SHU, Mr. Clark repeatedly requested that he be given mental health treatment, and that he be transferred to a facility capable of providing him with treatment.

57.     When Mr. Clark would report his need for better mental health treatment or question why he was kept in the SHU for months and months, he was retaliated against with longer stays in the SHU and being placed in the "naked room." The "naked room" is an isolation cell that contains only a commode and single mattress on the floor. Prisoners are kept in those cells with only an open smock for clothing.

58.     In the "naked room," prisoners are not provided any sort of effective mental health treatment. Mr. Clark was thus given an unacceptable choice – suffer from grossly inadequate mental health treatment in silence, or express the need for mental health treatment and risk being placed in the naked room or being assigned more time in isolation.

59.     Defendants treated Mr. Clark's repeated attempts to obtain mental health treatment and due process as disciplinary violations and responded by lengthening his time in the SHU.

(ii)     Defendants deprived Mr. Clark of minimally adequate health care.

60.     The State of Delaware exercises its right to punish Mr. Clark by incarceration and denying him a venue independent of the State to obtain needed medical care.

61.     It is only those health care providers authorized by the State to whom Mr. Clark may turn for medical care.

62.     Defendants with deliberate indifference ignored Mr. Clark's need for and denied his requests for adequate counselling and proper medication, causing Mr. Clark serious harm.

63.     The Medical Provider defendants consistently gave Mr. Clark deleterious medications and failed to give Mr. Clark any counselling for extended periods of time, despite his diagnoses of schizophrenia and manic depression.

64.     The only medical providers Mr. Clark encountered while in the SHU, were: (1) Montgomery, Mumford, and Johnson, who administered medicines (including Zyprexa, which caused Mr. Clark to experience pronounced hallucinations and adverse and allergic side effects, such as paralysis and intense pain in his legs) through by sliding them through slots in the doors that are opened briefly for that purpose; and (2) Yunis who shouted through the glass to Mr. Clark every few months concerning his medications.

65.     The Medical Provider defendants continue to administer Zyprexa to Mr. Clark despite their knowledge that he is allergic to the drug and that it continues to cause significant adverse side effects.

66.     The deficiency in professional care resulted in further deterioration of Mr. Clark's mental health, including an increase in depression, hallucinations, and self-mutilation.

67.     Defendants kept Mr. Clark in solitary confinement for months at a time, inflicting cruel and unusual punishment, even though it is well known to corrections and medical professionals throughout the United States—as the National Commission on Correctional Health Care ("NCCHC") and APA standards demonstrate—that extended periods of solitary confinement exacerbate the symptoms of mental illness for prisoners and result in further deterioration of their mental health.

68.     Defendants' policy is that SHU inmates must "earn their way out of the SHU by exhibiting appropriate behavior, complying with institutional rules and participating in treatment, education, and/or work programs."

69.     While in isolation, Mr. Clark would have to yell and bang on the door to get the attention of DOC officials.  Defendants reacted by increasing the severity or length of Mr. Clark' isolation.

70.     Defendants considered Mr. Clark's manifestations of mental illness and misery at being in the SHU, such as yelling, difficulty "calming down," or banging on cell doors to be disciplinary incidents, prolonging Mr. Clark's unwarranted time in solitary confinement

(iii)    <u>Defendants do not properly evaluate mental illness or distinguish misconduct from manifestations of mental illness.</u>

71.     An essential element of the treatment of prisoners with mental illness is a review by mental health staff of a prisoner and his or her mental health records to determine whether the prisoner's existing mental health needs contraindicate placement in solitary confinement or require other accommodation.

72.     DOC's Policy Manual requires it to: review a prisoner's medical record prior to or within one hour of placement in solitary confinement for mental health conditions; identify those prisoners whose conditions would be contrary to confinement in segregation, including prisoners

with serious mental illness; refer immediately to mental health personnel for follow-up prisoners who have received any treatment in the past five years for serious mental illness, prior to placement in solitary confinement; conduct an assessment of the prisoner *in a private setting* within 24 hours of a mentally ill prisoner's placement in solitary confinement; and after completing the assessment, review the disciplinary charges against the prisoner and evaluate what role the prisoner's mental illness played in his or her conduct.

73.     In deciding to place Mr. Clark, a mentally ill prisoner, in solitary confinement for alleged rule violations, Defendants did not adhere to DOC policy, failed to consider sufficiently the role mental illness played in causing the alleged rule violations, and failed to consider sufficiently the role mental illness in determining the appropriateness of sanctions or the conditions or duration of the sanctions.

74.     DOC's Policy Manual also requires it to monitor prisoners in the SHU with mental illness daily and to evaluate those prisoners three times per week.  Monitoring requires, at a minimum, "verbally offering the patient a sick call slip and visually observing whether the patient requires any emergent, urgent or routine health care."  Evaluation must be performed by mental health personnel, and includes, at a minimum, "a face to face encounter where the clinician speaks to the patient, observes the patient's mental health condition and verifies the patient is receiving any prescribed psychotropic medication."  Evaluation should also include "an assessment of potential decompensation and assessment of appropriate treatment and placement."

75.     Defendants failed to monitor Mr. Clark in the SHU on a daily basis in accordance with DOC's Policy Manual, and their "evaluation" of Mr. Clark fell below the minimal threshold defined in the DOC Policy Manual.

76.     Cell-front visits do not comply with the privacy standards set forth in DOC's Policy Manual, which require that healthcare be provided "in a manner and location that promotes confidentiality" and mandate that "clinical encounters and discussions occur in private, without being observed or overheard."   Nor do such visits conform to the privacy requirements of the Health Insurance Portability Accountability Act of 1996 ("HIPAA").  Such visits do not constitute meaningful mental health treatment, as DOC recognizes.

77.     The DOC defendants made deliberate decisions in conjunction with the Medical Provider defendants to deny Mr. Clark even minimum mental health care.

78.     Defendants' policy and practice of placing and keeping SMI prisoners like Mr. Clark in the SHU because of their mental illness defeats the goals of proper mental health treatment, rehabilitation, and successful reintegration into society upon release from prison.

(iv)     Defendants did not provide adequate housing options for Mr. Clark.

79.     There is a specialized unit for prisoners with mental illness who are deemed incapable of remaining in other maximum security housing, referred to as the Special Needs Unit ("SNU").  Some of the cells in that unit are and were vacant at the relevant times, and Mr. Clark could have been treated there rather than being confined in the SHU in solitary confinement and deprived of the treatment he needed.  Further, Mr. Clark could have been placed in a secure building at the Delaware Psychiatric Center ("DPC"), which can provide him with appropriate treatment, rather than suffering needlessly in the SHU.

80.     The DOC and Medical Provider defendants denied Mr. Clark's requests for such alternative housing with deliberate indifference to the serious harm their denials had on his physical and mental health, and the resulting lasting damage to his ability to successfully reintegrate into society upon his scheduled release from prison in 2019.

14

**C. Defendants were aware of and approved of the practice of housing Mr. Clark in the SHU in retaliation for conduct related to his SMI and other protected conduct.**

81.     All defendants are and were aware of Mr. Clark's SMI by virtue of the Mr. Clark's treatment for SMI while under the care of the DOC since at least 2006.

82.     In 2015, the year before Mr. Clark was locked in the SHU for 7 months, Delaware state Rep. J.J. Johnson ("Johnson") who heads Delaware's House of Representatives Corrections Committee, introduced legislation to dramatically reform the DOC's abusive use of solitary confinement.  The bill would have banned the DOC from using solitary confinement as a punishment for disciplinary violations for more than 15 consecutive days or 20 days out of any 60-day period.  It would have also prohibited placing the mentally ill or juveniles in solitary confinement.

83.     To avoid having Johnson push forward such legislation, the DOC agreed to a study conducted by the American Correctional Association ("ACA") on DOC's abusive use of solitary confinement to punish and control SMI prisoners.  The ACA released the results of the study in March 2016, two months into Mr. Clark's seven-month stay in the SHU and five months before he was released from the SHU.

84.     The study recommended that DOC develop more robust mental health programs, allow all prisoners outside their cells for at least an hour a day (and not count time for a shower in that hour), provide better, more consistent training to staff than the existing four-hour initial training, train staff on administration of medication, ensure that mental illness is not exacerbated by placing inmates in the SHU, and develop policy and procedure to provide more transparency and consistency in classifications, including giving less authority to the warden to override classifications.

85.     In 2006, the U.S. Department of Justice entered into a Memorandum Agreement ("Agreement") with the State of Delaware to attempt to address violations of the constitutional rights of inmates in the Delaware prison system due to seriously deficient medical care, mental health care, and suicide prevention.   Mr. Clark provided assistance and information in the investigation ("DOJ Investigation") and proceeding related to the Agreement.

86.     This study, the DOJ's Investigation, other prior lawsuits, and Defendants familiarity with their own policy and practice gave Defendants notice of the extreme adverse effects of the DOC's practice of holding Mr. Clark and other SMI inmates in solitary confinement rather than treating their SMI.

87.     As the NCCHC notes, "federal courts have repeatedly found the solitary confinement of the mentally ill to be unconstitutional, and in 2012, the [APA] adopted a policy opposing the 'prolonged segregation of prisoners with serious mental illness, which it defined as longer than 3 to 4 weeks."

88.     Defendants Coupe and Phelps are statutorily authorized and responsible for the oversight, operation, and administration of Delaware's correctional system and the Delaware Prisons.   At all times relevant to this FAC, they had full and active charge of the DOC and the JTVCC, and its facilities and services.   A DOC Commissioner is the DOC's chief executive and administrative officer.   Coupe was and Phelps is responsible for the organization, maintenance, control, and operation of the DOC, the administration, supervision, operation, management, and control of the Delaware Prisons, and the custody, study, training, treatment, correction, and rehabilitation of all prisoners in DOC custody.   11 *Del. C.* §§ 6516, 6517.

89.     Instead of treating Mr. Clark and other mentally ill prisoners for their SMI, Defendants, including Coupe and Phelps, sanctioned and adhered to a practice of housing

hundreds of SMI prisoners, including Mr. Clark, in the SHU because of and in retaliation for conduct related to their SMI.  Defendant Coupe had knowledge of and responsibility for DOC's placement of Mr. Clark in the SHU and his 7-month-long stay there during 2015.

90.     Defendants Coupe and Phelps, individually or in their official capacities, intentionally or with deliberate indifference inflicted cruel and unusual punishment on Mr. Clark, in violation of his constitutional rights.  Coupe and Phelps, individually or in their official capacities, intentionally or with deliberate indifference caused serious harm and significantly worsened the symptoms of Mr. Clark's SMI by disciplining him and retaliating against him for conduct related to his SMI, or by authorizing, approving of, and directing this treatment of Mr. Clark.

91.     Coupe and Phelps, individually or in their official capacities, placed and held Mr. Clark for 7 months in the SHU and denied him mental health treatment, or authorized, approved of, or directed this treatment of Mr. Clark.  Coupe and Phelps, individually or in their official capacities, caused Mr. Clark to experience increased hallucinations, panic attacks, paranoia, nightmares, and self-mutilation.

92.     Coupe and Phelps, individually or in their official capacities, have the power and authority to remedy the damage done to Mr. Clark and to prevent such treatment in the future.

93.     Defendants Pierce and Metzger, individually or in their official capacities, as wardens, have the power to veto and control all decisions to re-classify an inmate's status, including housing status.  Pierce made or approved the decision to house Mr. Clark in the SHU and to continue to house Mr. Clark in the SHU month after month, despite knowledge of, and indeed because of, Mr. Clark's serious mental illness.

94.     Defendant Pierce participated in the ACA study noted above at least during a site visit by the ACA in November 2015.  The ACA noted that Pierce was not "open to change in regards to restrictive housing objective and classification concerning the mentally ill," and that Pierce several times noted his authority "to over-ride decision on classification and/or mentally ill treatment decisions."

95.     In violation of Mr. Clark's constitutional rights, Defendants Pierce and Metzger, individually or in their official capacities, intentionally or with deliberate indifference inflicted cruel and unusual punishment on Mr. Clark, and retaliated against him for conduct related to his SMI, loud voice, or minor infractions.  Defendants Pierce and Metzger, individually or in their official capacities, caused serious harm and significantly worsened the symptoms of Mr. Clark's SMI by placing and holding him for 7 months in the SHU and denying him mental health treatment, or by authorizing, approving of, or directing this abuse of Mr. Clark.  Defendants Pierce and Metzger, individually or in their official capacities, caused Mr. Clark to experience increased hallucinations, panic attacks, paranoia, nightmares, and self-mutilation.

96.     Defendants Pierce and Metzger, individually or in their official capacities, have the power and authority to remedy the damage done to Mr. Clark and to prevent such treatment in the future.

97.     Defendants Metzger, Carouthers, Burton, Risploi, and Willy, with the collaboration of Pierce, Metzger, and Coupe and the Medical Provider defendants, made decisions to place and keep Mr. Clark in the SHU for exorbitant periods of time.  Metzger, Carouthers, Burton, Risploi, and Willy, individually or in their official capacities, disciplined Mr. Clark and retaliated against him for conduct related to his SMI, loud voice, or minor infractions, and intentionally or with deliberate indifference inflicted cruel and unusual punishment, in

violation of Mr. Clark's constitutional rights.  These defendants, individually or in their official capacities, with the approval and knowledge of defendants Coupe, Pierce, and Metzger, caused serious harm and significantly worsened the symptoms of Mr. Clark's SMI by placing him for lengthy periods of time in the SHU and denying him mental health treatment, causing him to experience increased hallucinations, panic attacks, paranoia, nightmares, and self-mutilation.

98.     Metzger, Carouthers, Burton, Risploi, and Willy, individually or in their official capacities, have the power and authority to remedy the damage done to Mr. Clark and to prevent such treatment in the future.

99.     Lynch, individually or in his official capacity, supervised the other Medical Provider defendants, advised them on their deleterious treatment of Clark, and participated in the decisions to keep Mr. Clark in the SHU for long periods of time and to continue administering seriously harmful medications to Mr. Clark, in collaboration with the other Medical Provider defendants and DOC defendants.

100.     Muñoz, individually and in her official capacity, supervised the other Medical Provider defendants, advised them and participates in the deleterious treatment of Clark, and participated in the decisions to keep Mr. Clark in the SHU for long periods of time and to continue administering seriously harmful medications to Mr. Clark, in collaboration with the other Medical Provider defendants and DOC defendants.

101.     Yunis administered and made decisions to continue administering seriously harmful medications to Mr. Clark, and made decisions to keep him in the SHU for long periods of time in collaboration with the other Medical Provider defendants and DOC defendants.

102.     Montgomery administered and made decisions to continue administering seriously harmful medications to Mr. Clark, and made decisions to keep him in the SHU for long

periods of time in collaboration with the other Medical Provider defendants and DOC defendants.

103.    Mumford administered and made decisions to continue administering seriously harmful medications to Mr. Clark, and made decisions to keep him in the SHU for long periods of time in collaboration with the other Medical Provider defendants and DOC defendants.

104.    Johnson administered and made decisions to continue administering seriously harmful medications to Mr. Clark, and made decisions to keep him in the SHU for long periods of time in collaboration with the other Medical Provider defendants and DOC defendants.

105.    The Medical Provider defendants, individually or in their official capacities, have the power and authority to remedy the damage done to Mr. Clark and to prevent such treatment in the future.

### D. Defendants Know And Are Deliberately Indifferent To The Harm That Their Solitary Confinement Practices Imposed On Mr. Clark.

106.    Defendants knew and were deliberately indifferent to the fact that Defendants' practice of housing Mr. Clark in solitary confinement, because and in spite of his SMI, created a substantial risk of serious harm to him.

107.    Defendants knew and were deliberately indifferent to the following:

a) Placing Mr. Clark, who is SMI, in solitary confinement created a substantial risk of exacerbating mental health symptoms and causing deterioration of his mental health;

b) While in solitary confinement, Mr. Clark received no meaningful mental health treatment;

c) Lack of counselling and psychological rehabilitation services caused a worsening of Mr. Clark's symptoms;

d) Defendants intolerably increased the duration of Mr. Clark's incarceration in solitary confinement because Defendants responded to manifestations of serious mental illness or anguish from extreme isolation by Mr. Clark as if they were disciplinary violations;

20

e) Defendants retaliated against Mr. Clark's request for mental health treatment and requests for an explanation for his lengthy stay in the SHU by lengthening his time in the SHU and transferring him, or approving his transfer, to the "naked" room;

f) Defendants do not have a sufficient number of cells in the specialized housing unit designed for mentally ill prisoners at JTVCC for all of the prisoners who need the mental health treatment, and Defendants have knowingly failed to increase the number of those cells;

g) Defendant Corrections deliberately underbid its contract with DOC with conscious disregard for the severe impact its lack of funding has on the health of Mr. Clark and other prisoners with SMI;

h) Defendants failed to place Mr. Clark at another housing unit where he could receive mental health care.

108.    Defendants had the authority and ability to avoid and to correct their practices described herein by taking reasonable measures but deliberately did not do so, internationally inflicting extreme emotional and mental distress and lasting harm on Mr. Clark.

109.    Mr. Clark has served the majority of his sentence, and is scheduled for release in 2019.  In addition to the extreme emotional and mental distress and lasting harm to Mr. Clark outlined above, Defendants cruel and unusual treatment of Mr. Clark has seriously impaired his ability to reintegrate into society upon his currently scheduled release date.

### COUNT I – PLACEMENT IN THE SHU
### (Violation Of The Eighth Amendment As Applied Through Due Process Clause Of The Fourteenth Amendment)

110.    Mr. Clark incorporates by reference the preceding Paragraphs of this FAC.

111.    The Eighth Amendment, as applied to the states by the Fourteenth Amendment, prohibits cruel and unusual punishment.

112.    Defendants' policies, practices, and procedures systematically violate the Eighth Amendment rights of Mr. Clark through institutional policies, practices, and procedures that

place him at substantial risk of serious harm.  Such policies, practices, and procedures include, without limitation:

- confinement in solitary confinement for exhibiting conduct caused by his mental illness, which poses a substantial risk of serious harm to Mr. Clark;

- a disciplinary system that fails to adequately consider Mr. Clark's serious mental illness and the impact of isolation in assessing whether to assign Mr. Clark to or continue to confine him to solitary confinement;

- maintenance of conditions in solitary confinement that exacerbate Mr. Clark's serious mental illnesses, including near-constant isolation with little if any human contact, resulting in unnecessary pain and suffering and serious harm to Mr. Clark;

- failure to provide adequate psychiatric and psychological services, resulting in unnecessary pain and suffering and worsening of Mr. Clark's mental illness;

- failure to transfer Mr. Clark to units equipped to treat his mental illness;

- failure to make available, maintain, and utilize adequate therapeutic alternatives and rehabilitative activity, such as attending religious services, holding a prison job, participating in therapeutic and educational programs, and having sufficient access to visits, telephone, reading material, television and radio, and recreational opportunities.

113.   Defendants have been made aware of and are deliberately indifferent to the deprivations suffered by Mr. Clark by virtue of their prior knowledge of Mr. Clark's mental illness diagnoses, prior knowledge of the serious mental health implications of long term confinement in isolation, and Mr. Clark's repeated requests for adequate treatment for his mental illness.

114.   Defendants' deliberate indifference is the proximate cause of the harm suffered by Mr. Clark, including pronounced worsening of his symptoms of hallucination, depression, and self-mutilation.

115.     Defendants, acting under color of state law, violated Mr. Clark's rights, guaranteed by the Eighth Amendment as applied through the Due Process Clause of the Fourteenth Amendment, and will continue to violate them if this Court does not grant relief.

## COUNT II – GROSSLY INADEQUATE MEDICAL CARE
### (Violation Of The Eighth Amendment As Applied Through Due Process Clause Of The Fourteenth Amendment)
### (Medical Provider Defendants)

116.     The Medical Provider defendants acting under color of state law violated Mr. Clark's constitutional rights by misusing their power and demonstrating deliberate indifference to his serious medical needs and causing substantial deprivation and lasting harm.

117.     Rather than providing Mr. Clark with the counselling he needs and proper medication for his SMI, the Medical Provider defendants administered the wrong medications knowing Mr. Clark was allergic and suffering profound adverse side effects.

118.     The Medical Provider defendants participated in the decisions to place and keep Mr. Clark in the SHU for exorbitant periods of time, causing him serious harm as described herein.

119.     These defendants also failed to provide any counseling at all while Mr. Clark was in the SHU and provided grossly inadequate and sporadic counselling when he was not in the SHU.

120.     The Medical Provider defendants have been aware of and are deliberately indifferent to the deprivations suffered by Mr. Clark by virtue of their prior knowledge of Mr. Clark's mental illness diagnoses, prior knowledge of the serious mental health implications of long term confinement in isolation, knowledge of Mr. Clark's allergies to the medications they administered, and Mr. Clark's repeated requests for adequate treatment for his mental illness.

121.    The Medical Provider Defendants' deliberate indifference is the proximate cause of the harm suffered by Mr. Clark, including pronounced worsening of his symptoms of hallucination, depression, and self-mutilation.

122.    The Medical Provider, acting under color of state law, violated Mr. Clark's rights, guaranteed by the Eighth Amendment as applied through the Due Process Clause of the Fourteenth Amendment, and will continue to violate them if this Court does not grant relief.

**COUNT III**
**Violation of the First and Fifth Amendments (Pursuant to 42 U.S.C. § 1983): Retaliation**
**(As Applied Through Due Process Clause Of The Fourteenth Amendment)**

1.    Mr. Clark hereby incorporates by reference the preceding paragraphs of this FAC.

2.    Defendants violated Mr. Clark's First and Fifth Amendment rights as applied to the State through the Fourteenth Amendment by their actions as alleged and described in this FAC, in retaliating against Mr. Clark and conspiring in and furthering such retaliation for, among other things, (i) requesting medical treatment, (ii) requesting for explanations of why he was in the SHU, (iii) mental illness and manifestations thereof, and (iv) providing information and assistance in the 2006 DOJ Investigation.

**COUNT IV**
**Violation of the Fifth and Fourteenth Amendment (42 U.S.C. § 1983): Procedural Due**
**Process Violation for Placement in Solitary Confinement without Due Process**
**(DOC Defendants)**

3.    Mr. Clark hereby incorporates by reference the foregoing paragraphs of this FAC.

4.    The DOC Defendants' transfer of Mr. Clark to a solitary confinement cell constitutes an atypical and significant hardship on Mr. Clark.

5.    The DOC Defendants failed to follow DOC Policy for such a transfer, contradicting Mr. Clark's security classification, and providing no explanation for the reasons for

the transfer or an opportunity for Mr. Clark to be heard or to consult with counsel prior to additional time in restrictive housing.

6.       The DOC Defendants' conduct violates Mr. Clark's right to due process under the Fifth and Fourteenth Amendments of the United States Constitution.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Clark respectfully requests that this Court enter judgment in his favor and against the Defendants, and that this Court further:

1. Declare that the acts set forth herein are in violation of Mr. Clark's rights under the Constitution and laws of the United States;

2. Order appropriate declaratory and injunctive relief, including appropriate orders to stop the constitutional violations described above and directing that:

   a. Mr. Clark shall not be confined to the SHU;
   b. If prison officials determine, in consultation with a medical doctor who evaluates Mr. Clark at the time and agrees with the officials' documented determination, that Mr. Clark is an immediate danger and needs to be segregated from the general population, and there is no reasonable alternative, Mr. Clark shall be placed in a facility, such as the SNU or DPC, capable of providing him with proper mental health care as set forth in his individual treatment plan;
   c. Mr. Clark shall be given mental health treatment, including regular counseling sessions no less than twice a month, in a private setting determined by a medical doctor or licensed clinical social worker to be conducive to mental health counselling in a manner and location that promotes confidentiality;
   d. Mr. Clark shall have an individual treatment plan that shall be implemented regardless of his housing;
   e. Mr. Clark's individual treatment plan shall include components to remedy the extreme damage done to him by DOC's cruel and unusual punishment of Mr. Clark, and shall include a re-entry plan to be implemented beginning in early 2018 to prepare Mr. Clark for successful reintegration into society upon his currently scheduled release date in 2019;
   f. Mr. Clark's medications shall be evaluated by a medical doctor in consultation with Mr. Clark in a private setting no less than every three months;
   g. Mr. Clark shall have no less than three hours per day outside his cell regardless of his housing situation;

3. award Mr. Clark compensatory and punitive damages;

4. award Mr. Clark attorneys' fees, expenses, and the costs associated with this action under 42 U.S.C. § 1988 and as otherwise allowed by law; and

5. grant Mr. Clark any other relief that this Court deems just and proper.

Mr. Clark requests a jury trial for all issues so triable.

Dated:  January 12, 2018                    Respectfully submitted,

                                            BARNES & THORNBURG LLP

                                            */s/  Chad S.C. Stover*
                                            Chad S.C. Stover (No. 4919)
                                            Regina S.E. Murphy (No. 5648)
                                            1000 North West Street, Suite 1500
                                            Wilmington, DE  19801
                                            Tel: 302-300-3434
                                            Fax: 302-300-3456
                                            Email:  chad.stover@btlaw.com
                                            Email:  gigi.murphy@btlaw.com

                                            *Attorneys for Plaintiff*