# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

ANGELO LEE CLARK,          :
                              :
                Plaintiff,      :
                              :
        v.                   :     C. A. No. 17-66-RGA-MPT
                              :
ROBERT COUPE, ET AL.,       :
                              :
            Defendants.    :

# REPORT AND RECOMMENDATION

## I. INTRODUCTION

On January 12, 2018, Angelo Lee Clark ("Clark" or "plaintiff") filed a first amended complaint ("FAC") alleging Robert M. Coupe ("Coupe"), Perry Phelps ("Phelps"), Dana Metzger ("Metzger"), David Pierce ("Pierce"), Major Jeffrey Carrothers ("Carrothers"), Captain Bruce Burton ("Burton"), Captain Marcello Rispoli ("Rispoli"), Captain Ronald Willey ("Willey"), Dr. William Ray Lynch ("Lynch"), Dr. Paola Muñoz ("Muñoz"), Dr. David Yunis ("Yunis"), Rhonda Montgomery ("Montgomery"), Susan Mumford ("Mumford"), and Stephanie D. Johnson ("Johnson") (collectively, "defendants") violated his rights under the First, Fifth, and Eighth Amendments of the United States Constitution as applied through the Due Process Clause of the Fourteenth Amendment.[1]

---

[1] D.I. 29 at ¶ 2. Clark initiated this action with the filing of a *pro se* complaint on January 23, 2017. D.I. 1. Coupe, Phelps, Metzger, Pierce, Carrothers, Burton, Rispoli, and Willey are all either current or former employees of the Delaware Department of Correction ("DOC") and are collectively referred to as the "DOC Defendants." D.I. 29 at ¶ 34. The FAC identifies defendant Captain Ronald Willey's last name as "Willy"; his

Currently before the court are the DOC Defendants' and the Medical Defendants' motions to dismiss pursuant to FED. R. CIV. P. 12(b)(6).[2]

## II.  FACTUAL BACKGROUND[3]

Clark seeks damages and injunctive relief for his cruel and unusual punishment in Delaware prisons, claiming defendants' conduct violates his rights under the First, Fifth, and Eighth Amendments of the United States Constitution, as applied through the Due Process Clause of the Fourteenth Amendment.[4]

---

counsel identifies that defendant's last name as "Willey."  *See, e.g.*, D.I. 33 at 1.  Lynch, Muñoz, Yunis, Montgomery, Mumford, and Johnson are medical care and mental health providers at JTVCC and are collectively referred to as the "Medical Defendants".  D.I. 29 at ¶ 35.  The FAC incorrectly identifies defendant Dr. William Ray Lynch's first name as Edward.  *Id.* at ¶ 28; D.I. 35 at 1 n.2.

[2] D.I. 32 & D.I. 34, respectively.  Briefing on the DOC Defendants' motion is found at D.I. 33, D.I. 38, and D.I. 43.  Briefing on the Medical Defendants' motion is found at D.I. 35, D.I. 37, and D.I. 40.

[3] This factual background is taken from the FAC.  Factual allegations in the FAC specific to Clark's claims against the DOC Defendants and the Medical Defendants are recited, and/or reiterated, in the court's discussion of the motions submitted by each group of defendants.

[4] *Id.* at ¶¶ 1-2.  The FAC recites the alleged violations in four counts.  Count I (Placement in the SHU) and Count II (Grossly Inadequate Medical Care) allege Violation of the Eighth Amendment as applied through the Due Process Clause of the Fourteen Amendment.  *Id.* at ¶¶ 110-22.  Count III (Retaliation) alleges Violation of the First and Fifth Amendments (pursuant to 42 U.S.C. § 1983) as applied through the Due Process Clause of the Fourteenth Amendment.  *Id.*, Count III at ¶¶ 1-2.  Count IV (Procedural Due Process Violation for Placement in Solitary Confinement without Due Process (DOC Defendants)) alleges Violation of the Fifth and Fourteenth Amendments (pursuant to 42 U.S.C. § 1983).  *Id.*, Count IV at ¶¶ 3-6.  Counts III and IV appear to be misnumbered.  The court cites allegations in those counts as D.I. 29, Count III at ¶¶ ___, and D.I. 29, Count IV at ¶¶ ___.  Count II is specifically directed against the Medical Defendants.  Count IV is specifically alleged against the DOC Defendants.  Counts I and III recite allegations against "Defendants" without specifying which individuals identified in the FAC as members of the DOC Defendants or Medical Defendants as committing the alleged violations.

Clark is incarcerated at James T. Vaughn Correctional Center ("JTVCC").[5]  He has been diagnosed with serious mental illness ("SMI"), including manic depression and paranoid schizophrenia, for which he has been treated since at least 2006 while incarcerated in DOC facilities.[6]  During the past few years, in retaliation for Clark's SMI, loud voice, or minor rule infractions, Clark was frequently placed in solitary confinement in JTVCC's segregated housing unit ("SHU"; also referred to herein as "solitary confinement" or "restrictive housing") with no due process and without receiving proper medical and mental health treatment for his serious medical and mental health needs.[7]  While in the SHU, Clark was deprived of any meaningful mental health treatment and given medications the mental health staff knew caused serious allergic reactions and increased hallucinations.[8]  He was treated infrequently by a mental health provider, going weeks and months without any medical healthcare provider interaction and no mental health counseling.[9]

SMI prisoners in the SHU are completely isolated and denied adequate medical and mental health care.[10]  The SHU consists of extremely small cells where prisoners are confined for twenty-four hours a day, except for one hour every other day when they are permitted out of their cells.[11]  The doors of the SHU cells are essentially solid, with a

---

[5] *Id.* at ¶¶ 1, 3.  Clark has been in the custody of the DOC since 2004 and is scheduled for release in 2019.  *Id.* at ¶¶ 19, 109.

[6] *Id.* at ¶¶ 1, 5.

[7] *Id.* at ¶ 1.

[8] *Id.* at ¶ 9.

[9] *Id.*

[10] *Id.* at ¶ 4.

[11] *Id.*

single four-inch-wide window.[12]  Correctional officers deliver meals to prisoners by sliding food through slots in the doors that are opened briefly for that purpose.[13]  Lights are on for all but approximately six hours per day, and few visitors or phone calls are permitted, among other privilege limitations.[14]  Research studying solitary confinement shows these types of conditions can cause psychological harm and even brain shrinkage, which can occur within a few days.[15]  That research concluded fifteen days is the "outer bounds" of what is tolerable.[16]

Clark was housed in solitary confinement at JTVCC for nearly six months in 2012 (and for various other lengthy periods prior to that), for fifteen days in 2015, and for seven months from January to August 2016.[17]  As a result of frequent long term confinement in the SHU, Clark experienced increased hallucinations, paranoia, self-mutilation, sleeplessness, and nightmares.[18]  Prison officials regarded those manifestations of disease as prison rule infractions and resulted in additional time in solitary confinement and consequent privilege limitations.[19]  This created a situation where Clark's mental illness trapped him in a cycle of isolation and punishment which deprived him of adequate mental health treatment and resulted in further deterioration of his mental condition.[20]

---

[12] *Id.*
[13] *Id.* at ¶ 8.
[14] *Id.*
[15] *Id.* at ¶ 10.
[16] *Id.*
[17] *Id.* at ¶ 11.
[18] *Id.* at ¶ 12.
[19] *Id.*
[20] *Id.* at ¶ 13.

Defendants failed to take reasonable measures to ameliorate the risk of serious

harm to Clark and instead used solitary confinement as a substitute for providing proper

mental healthcare.[21]  Defendants were aware of Clark's SMI and that his placement in

solitary confinement and denial of proper health treatment would cause severe and

adverse effects.[22]  Defendants intentionally caused, or were deliberately indifferent to

the substantial risk of serous harm to Clark.[23]  Defendants' practice of housing Clark in

the SHU as a substitute for mental health treatment inflicted severe mental and

emotional distress and exacerbated Clark's SMI by depriving him of the opportunity to

engage in normal human interactions, which promote mental health and well being,

such as talking with or seeing others, working, participating in educational or

rehabilitative programs, or attending religious services.[24]

Clark seeks damages, a declaration that defendants are violating the Eighth

Amendment of the U. S. Constitution, a permanent injunction requiring defendants to

cease violating Clark's Eighth Amendment and Article I, Section 11 rights, and to protect

him against dangerous and unconstitutional conditions of confinement.[25]

## III.    LEGAL STANDARDS

In analyzing a motion to dismiss under FED. R. CIV. P. 12(b)(6), a review of Rule

8(a)(2) is necessary.

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a
"short and plain statement of the claim showing that the pleader is entitled

---

[21] *Id.* at ¶ 14.
[22] *Id.* at ¶¶ 5, 6.
[23] *Id.* at ¶ 6.
[24] *Id.* at ¶ 7.
[25] *Id.* at ¶ 15.

to relief."  As the Court held in *Twombly* . . . , the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.  A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement."[26]

Thus, to survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"[27]  The purpose of a Rule 12(b)(6) motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case.[28]  "The issue is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims."[29]  A motion to dismiss may be granted only if, after, "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to the plaintiff, plaintiff is not entitled to relief."[30]

The factual allegations must be sufficient to "raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."[31]  A plaintiff is obliged "to provide the 'grounds' of his 'entitle[ment] to relief'" beyond "labels and conclusions."[32]  Heightened fact pleading is

---

[26] *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (alteration in original) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)).

[27] *Id.* at 678 (citing *Twombly*, 550 U.S. at 570); *see* FED. R. CIV. P. 12(b)(6).

[28] *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).

[29] *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (internal quotation marks and citation omitted).

[30] *Maio v. Aetna, Inc.*, 221 F.3d 472, 481-82 (3d Cir. 2000) (internal quotation marks and citations omitted).

[31] *Twombly*, 550 U.S. at 555; *see also Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007).

[32] *Twombly*, 550 U.S. at 555.

not required: rather, "enough facts to state a claim to relief that is plausible on its face" must be alleged.[33] "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief."[34] The plausibility standard does not rise to a "probability requirement," but requires "more than a sheer possibility that a defendant has acted unlawfully."[35] Unsupported allegations, "bald assertions," and "legal conclusions" are rejected.[36] "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss," determination of which is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[37] Well-pled facts that only infer the "mere possibility of misconduct," do not show "'the pleader is entitled to relief'" under Rule 8(a)(2).[38]

"To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record."[39] Rule 12(d) addresses the use of materials which are outside the pleadings in

---

[33] *Id.* at 570.
[34] *Iqbal*, 556 U.S. at 679.
[35] *Id.* at 678.
[36] *Id.* ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *id.* ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."); *id.* at 681 (rejecting "bald allegations" because of "the conclusory nature" of those allegations); *see also Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) ("[A] court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss."); *Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light* Co., 113 F.3d 405, 417 (3d Cir. 1997) (The court is "not required to accept as true unsupported conclusions and unwarranted inferences.").
[37] *Iqbal*, 556 U.S. at 679.
[38] *Id.*
[39] *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993), *cert. denied*, 510 U.S. 1042 (1994).

motions to dismiss under Rule 12(b)(6).  When such materials are presented, the

motion is treated as one for summary judgment.  However, certain additional materials

may be considered without converting a motion to dismiss into a motion for summary

judgment.  A court is not limited to the four corners of the complaint and may consider

"'matters incorporated by reference integral to the claim, items subject to judicial notice,

matters of public record, orders [and] items appearing in the record of the case.'"[40]  A

plaintiff is entitled to notice and a fair opportunity to respond to any evidence the court

might consider in its review of a motion to dismiss.  Where a plaintiff has such notice,

however, it is proper for the court to consider that evidence.[41]

Section 1983 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen of the United States or
> other person within the jurisdiction thereof to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and laws, shall be
> liable to the party injured in an action at law, suit in equity, or other proper
> proceeding for redress, except that in any action brought against a judicial
> officer for an act or omission taken in such officer's judicial capacity,
> injunctive relief shall not be granted unless a declaratory decree was

---

[40] *Buck v. Hampton Tp. School Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (alteration in original) (quoting 5B Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357 (3d ed. 2004)); *see also Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999) ("To resolve a 12(b)(6) motion, a court may properly look at public records, including judicial proceedings, in addition to the allegations in the complaint."); FED. R. EVID. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it:  (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

[41] *Cf. Pension Benefit*, 998 F.2d at 1196-97 ("When a complaint relies on a document, however, the plaintiff obviously is on notice of the contents of the document, and the need for a chance to refute evidence is greatly diminished.") (internal citations omitted).

violated or declaratory relief was unavailable. . . .[42]

To adequately plead a violation of § 1983, "a plaintiff must plead that each Government-official defendant, through the official's own individual action, has violated the Constitution."[43] Because § 1983 cases often include government actors sued in their individual capacities, "it is particularly important . . . that the complaint make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state."[44]

## IV.    DISCUSSION

The DOC Defendants and the Medical Defendants separately move to dismiss Clark's complaint pursuant to FED. R. CIV. P. 12(b)(6) for failure to state a claim upon which relief can be granted.[45]

### A.    DOC Defendants' Motion to Dismiss

Coupe was the Commissioner of the DOC until January 2017.[46] Phelps is the Commissioner of the DOC.[47] Pierce was Warden of JTVCC until February 2017.[48] Metzger is Warden of JTVCC.[49] At all times relevant to the FAC, Carrothers, Burton,

---

[42] 42 U.S.C. § 1983.
[43] *Iqbal*, 550 U.S. at 676.
[44] *Robbins v. Oklahoma*, 519 F.3d 1242, 1249-50 (10th Cir. 2008) (emphasis in original) (citing *Twombly*, 127 S. Ct. at 1970-71 n.10).
[45] D.I. 32; D.I. 34.
[46] D.I. 29 at ¶ 20.
[47] *Id.* at ¶ 21.
[48] *Id.* at ¶ 23.
[49] *Id.* at ¶ 22.

Rispoli, and Willey were employed at JTVCC.[50]

The DOC Defendants move to dismiss Clark's complaint because: (1) plaintiff's demands for injunctive relief are moot; (2) plaintiff is unable to hold supervisory defendants vicariously liable for the acts of subordinates; (3) the DOC Defendants are entitled to qualified immunity because plaintiff has not plausibly pleaded that any of them engaged in a violation of clearly established constitutional law; and, (4) plaintiff fails to plausibly plead claims against any of the DOC Defendants.[51]

Clark argues the DOC Defendants' motion to dismiss should be denied because: (1) his request for injunctive relief is not moot; (2) the DOC Defendants cannot escape discovery because Clark is mentally ill; (3) the DOC Defendants violated clearly established law and are not entitled to qualified immunity; and (4) the FAC pleads facts plausibly alleging the DOC Defendants had knowledge of, and acquiesced in, the DOC's practice of housing Clark in solitary confinement because of his mental illness.[52]

The DOC Defendants contend Clark's demands for injunctive relief are moot.[53]

Clark seeks appropriate orders to stop the alleged constitutional violations and directing that:

(a)     Mr. Clark shall not be confined to the SHU;

(b)     If prison officials determine, in consultation with a medical doctor who evaluates Clark at the time and agrees with the officials' documented determination, that Clark is an immediate danger and needs to be segregated from the general population, and there is

---

[50] *Id.* at ¶¶ 24-27. All DOC Defendants are alleged to be state actors for the purposes of the Fourteenth Amendment. *Id.* at ¶¶ 20-27.
[51] D.I. 33 at 7-13.
[52] D.I. 38 at 10-20.
[53] D.I. 33 at 13.

no reasonable alternative, Clark shall be placed in a facility, such as the Special Needs Unit ("SNU") or the Delaware Psychiatric Center ("DPC"), capable of providing him with proper mental health care as set forth in his individual treatment plan;

(c)     Clark shall be given mental health treatment, including regular counseling sessions no less than twice a month, in a private setting determined by a medical doctor or licensed clinical social worker to be conducive to mental health counseling in a manner and location that promotes confidentiality;

(d)     Clark shall have an individual treatment plan that shall be implemented regardless of his housing;

(e)     Clark's individual treatment plan shall include components to remedy the extreme damage done to him by DOC's cruel and unusual punishment of Clark, and shall include a re-entry plan to be implemented beginning in early 2018 to prepare Clark for successful reintegration into society upon his currently scheduled release date in 2019;

(f)     Clark's medications shall be evaluated by a medical doctor in consultation with Clark in a private setting no less than every three months; and

(g)     Clark shall have no less than three hours per day outside his cell regardless of his housing situation.[54]

Because Clark was last held in the SHU in 2016,[55] and is no longer in solitary confinement, the DOC Defendants contend any of Clark's demands related to the conditions within the SHU are moot.[56]  They also maintain changes the DOC pledged  in a settlement agreement in *Community Legal Aid Society v. Coupe* demonstrate Clark's alleged harms are not capable of repetition.[57]  As part of that agreement, segregated

---

[54] D.I. 29 at 25 (Prayer for Relief).

[55] *Id.* at ¶ 11.

[56] D.I. 33 at 13.

[57] *Id.* (citing C.A. No. 15-688-GMS (D.I. 38, 40 (the "CLASI Agreement")).  A court may consider "items subject to judicial notice [and] matters of public record" on a motion to dismiss.  *Buck v. Hampton Tp. School Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (citing

housing at JTVCC is significantly less restrictive and used much more infrequently.[58]
Inmates will also receive additional mental health services.[59]  The DOC Defendants
conclude that because Clark is no longer held in SHU, coupled with the fact that the
SHU has been fundamentally changed since Clark's last stay there, his claims for
injunctive relief against the DOC Defendants moot.[60]

Clark argues the injunctive relief he seeks is not mooted by the CLASI
Agreement.[61]  He was not a signatory to the CLASI Agreement and was not a party to
the suit that resulted in that agreement.[62]  Importantly, Clark maintains he seeks
different and more specific relief than the changes in the use of restrictive housing at
JTVCC set forth in the CLASI Agreement.[63]

The court determines Clark's requested injunctive relief is not moot.  The DOC

---

5B Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357 (2004)).
When a plaintiff has notice and a fair opportunity to respond to any evidence the court
might consider in its review of a motion to dismiss, it is proper for the court to consider
that evidence.  *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d
1192, 1197 (3d Cir. 1993) ("The reason that a court must convert a motion to dismiss to
a summary judgment motion if it considers extraneous evidence submitted by the
defense is to afford the plaintiff an opportunity to respond."), *cert. denied*, 510 U.S. 1042
(1994).  Here, the CLASI Agreement is a matter of public record subject to judicial
notice.  Clark had notice of this evidence to which he responded in his opposition to the
DOC Defendants' motion to dismiss without objection to the court's consideration
thereof.  *See* D.I. 38 at 2, 16, 20.  The court also notes Clark cites the CLASI
Agreement in his opposition to the Medical Defendants' motion to dismiss.  *See* D.I. 37
at 5-6 (listing DOC's Policy Manual requirements concerning review, identification,
referral, assessment, and evaluation of inmate's mental health conditions recited in the
FAC and citing the CLASI Agreement) (citing D.I. 29 at ¶ 72; D.I. 33, Ex. A, § 1).
[58] D.I. 33 at 13.
[59] *Id.*
[60] *Id.*
[61] D.I. 38 at 2, 20.
[62] *Id.*
[63] *Id.*

Defendants rely on Sections 1 through 3 of the CLASI Agreement which set forth overarching changes regarding which DOC inmates may be subject to solitary confinement and the permissible duration of that confinement.[64] Section 1 provides for the creation of specialized units to care for the mentally ill, requires the DOC to work with the medical provider to increase mental health staffing, and purportedly addresses Clark's concern about symptoms of mental illness being used to impose discipline.[65] Section 2 mandates the DOC develop and implement a policy that will increase out-of-cell time for all inmates in non-disciplinary restrictive housing by providing that non-mentally ill inmates shall be offered 17.5 hours of unstructured recreation per week and mentally ill inmates shall be offered 17.5 hours of unstructured recreation per week plus additional out-of-cell time for structured therapeutic activities required under each mentally ill inmate's individualized mental health treatment plan.[66] Section 3 limits the use of disciplinary detention to no more than fifteen consecutive days for any single rule violation, or any related rule violations, and requires at least fifteen days between disciplinary detention sanctions.[67]

Those provisions do not moot Clark's requests for injunctive relief specific to his alleged harm. Although he is not currently held in the SHU, Clark seeks an order that he not be confined in the SHU in the future, and, if it is determined he is an immediate danger and needs to be segregated from the general population, he be placed in a

---

[64] D.I. 33 at 3 n.2.
[65] C.A. No. 15-688-GMS (D.I. 40 at 3-7); D.I. 33 at 3 n.2.
[66] C.A. No. 15-688-GMS (D.I. 40 at 8); D.I. 33 at 3 n.2.
[67] C.A. No. 15-688-GMS (D.I. 40 at 10-11); D.I. 33 at 3 n.2.

facility, such as the SNU and DPC, if there is no reasonable alternative.[68]  Clark also

demands that he be given mental health treatment, including regular counseling

sessions at least twice a month in a private setting that promotes confidentiality.[69]  He

further requests an individual treatment plan, regardless of his housing, that rectifies the

harm he suffered as a result of the DOC's alleged cruel and unusual punishment, and

includes a re-entry plan tailored for his successful reintegration into his society upon

release.[70]  Finally, Clark demands his medications be evaluated in consultation with a

medical doctor in a private setting at least every three months, and he have at least

three hours per day outside his cell regardless of his housing situation.[71]

Because the provisions of the CLASI Agreement cited by the DOC Defendants

do not resolve the specific issues for which Clark seeks injunctive relief, this requested

relief is not moot.[72]

The court next addresses the DOC Defendants' argument that Clark cannot hold

---

[68] D.I. 29 at 25, Prayer for Relief at ¶¶ 2(a), 2(b).

[69] *Id.*, Prayer for Relief at ¶ 2(c).

[70] *Id.*, Prayer for Relief at ¶¶ 2(d), 2(e).

[71] *Id.*, Prayer for Relief at ¶¶ 2(f), 2(g).

[72] In their opening brief, the DOC Defendants asserted "any demands related to the conditions within the SHU are moot" because he is not currently housed in the SHU and changes with respect to restrictive housing as a result of the CLASI Agreement make his alleged harms not capable of repetition.  D.I. 33 at 13.  In their reply brief, they repeat those arguments and make an entirely new argument based on the prospective nature of the injunctive and declaratory relief he seeks.  D.I. 43 at 8-9.  Delaware Local Rule 7.1.3(c)(2) recites:  "[t]he party filing the opening brief shall not reserve material for the reply brief which should have been included in a full and fair opening brief."  Although the DOC Defendants were responding, in part, to Clark's contention that the relief he sought is not moot, the nature of the relief Clark sought is clear in the FAC. The DOC Defendants should have raised the issue of the nature of the relief sought in their opening brief and by not doing so, they deprived Clark the opportunity to respond to this new argument.

supervisory defendants vicariously liable for the acts of subordinates.  It is well settled that supervisory liability cannot be imposed under § 1983 on a respondeat superior theory.  "The Third Circuit has reiterated that a § 1983 claim cannot be premised upon a theory of respondeat superior and that, in order to establish liability for deprivation of a constitutional right, a party must show personal involvement by each defendant."[73]

Although the DOC Defendants contend the FAC makes clear that Clark's claims against both Coupe and Phelps (and likely Pierce and Metzger) are rooted in vicarious liability,[74] Clark denies relying on a theory of supervisory liability.[75]  Instead, the FAC alleges the DOC Defendants' knowledge of, and participation and acquiescence in, the infliction of cruel and unusual punishment that resulted from the DOC's well-established policy of housing Clark in the SHU because of his SMI.[76]  With Clark's averment that he does not rely on a theory of supervisory liability, the court turns to the DOC Defendants' argument that they are entitled to qualified immunity because Clark has not plausibly pleaded any of them has engaged in a violation of clearly established constitutional law.[77]

Clark argues the DOC Defendants are not entitled to qualified immunity because they violated clearly established law prohibiting:  (1) housing SMI prisoners in solitary confinement, (2) failure to provide adequate medical and mental health treatment to SMI

---

[73] *Rahim v. Holden*, 831 F. Supp. 2d 845, 848 (D. Del. 2011) (citing *Brito v. United States Dep't of Justice*, 392 Fed. App'x 11, 14 (3d Cir. 2010)).
[74] D.I. 33 at 10 (citing D.I. 29 at ¶ 88).
[75] D.I. 38 at 2.
[76] *Id.*
[77] D.I. 33 at 11-13.

prisoners housed in solitary confinement, and (3) punishing an inmate for an illness.[78]

Qualified immunity "'shield[s] [government actors] from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[79] "Because qualified immunity is 'an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.'"[80] "[T]he 'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that '"insubstantial claims"' against government officials [will] be resolved prior to discovery.'"[81] Accordingly, the courts "'repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation.'"[82] "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery."[83]

---

[78] D.I. 38 at 11-12 (citing *Madrid v. Gomez*, 889 F. Supp. 1146, 1266-67; *Estelle v. Gamble*, 429 U.S. 97, 107 (1976); *Robinson v. California*, 370 U.S. 660, 666-68 (1962)).

[79] *Behrens v. Pelletier*, 516 U.S. 299, 305 (1996) (alterations in original) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[80] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (omission in original) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

[81] *Id.* at 231-32 (second alteration in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 n.2 (1987)); *see also Argueta v. United States Immigration & Customs Enf't*, 643 F.3d 60, 73 (3d Cir. 2011) ("[T]he 'basic thrust' of qualified immunity is to free officials from the concerns and burdens of litigation, including discovery.") (citing *Iqbal*, 129 S. Ct. at 1954); *Thomas v. Independence Twp.*, 463 F.3d 285, 291 (3d Cir. 2006) ("Because qualified immunity bestows immunity from suit, the Supreme Court 'repeatedly ha[s] stressed the importance of resolving immunity questions at the earliest possible stage in litigation.'") (alteration in original) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (*per curiam*)).

[82] *Pearson*, 555 U.S. at 232 (quoting *Hunter*, 502 U.S. at 227).

[83] *Mitchell*, 472 U.S. at 526 (citing *Harlow*, 457 U.S. at 818). "Factual allegations are particularly important in a § 1983 case where qualified immunity is asserted as an affirmative defense." *Swim v. Hendrick*, No. CIV-12-480-D, 2013 WL 3992440, at *2

In *Saucier v. Katz*,[84] the United States Supreme Court:

> [M]andated a two-step sequence for resolving government officials' qualified immunity claims. First, a court must decide whether the facts that a plaintiff has alleged (*see* FED. RULES CIV. PROC. 12(b)(6), (c)) . . . make out a violation of a constitutional right. Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct.[85]

In *Pearson*, the Court receded from *Saucier* holding that "the *Saucier* protocol should not be regarded as mandatory in all cases," noting that "[t]he procedure sometimes results in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case" such as where "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right."[86] *Pearson* "held that courts may grant qualified immunity on the ground that a purported right was not 'clearly established' by prior case law, without resolving the often more difficult question whether the purported right exists at all."[87]

"'To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'"[88]

---

(W.D. Okla. Aug. 2, 2013) (citing *Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008)).

[84] 533 U.S. 194 (2001).

[85] *Pearson*, 555 U.S. at 232 (citing *Saucier*, 533 U.S. at 201).

[86] *Id.* at 236-37.

[87] *Reichle v. Howards*, 556 U.S. 658, 664 (2012) (citing *Pearson*, 555 U.S. at 236); *see also Camreta v. Greene*, 563 U.S. 692, 705 (2011) ("If prior case law has not clearly settled the right, and so given officials fair notice of it . . . [t]he court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit."); *Thompson v. Howard*, 679 F. App'x 177, 181-82 (3d Cir. 2017) (making its qualified immunity determination by addressing only whether a clearly established constitutional right existed without deciding whether the defendant's actions violated the plaintiff's constitutional rights).

[88] *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (quoting *Reichle*, 132 S. Ct. at 2093); *see also Holman v. Walls*, CIV.A. No. 86-1-JRR, 1989 WL 66636, at *9 (D. Del.

"'When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law.'"[89]  Although a case directly on point is not required, "'existing precedent must have placed the statutory or constitutional question beyond debate.'"[90]  The Court stated "to the extent that a *robust consensus* of cases of persuasive authority in the Courts of Appeals could itself clearly establish the federal right respondent alleges, *City and County of San Francisco v. Sheehan* [135 S. Ct. 1765, 1779 (2015)], the weight of that authority at the time of Barkes's death suggested that such a right did *not* exist."[91]

"[A]lthough what 'constitutes a cruel and unusual punishment has not been exactly decided,' . . . '[t]he Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.'"[92]  A punishment may be cruel and unusual when it "goes beyond what is necessary to achieve [a

---

June 13, 1989) (stating the "focus" for purposes of the court's inquiry of the individual defendants' entitlement to qualified immunity is whether their actions were objectively reasonable "'in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation'") (quoting *Graham v. Connor*, 109 S. Ct. 1865, 1867 (1989)); *Thompson v. Montemuro*, 383 F. Supp. 1200, 1207 (E.D. Pa. 1974) ("'[Q]ualified immunity is available to officers of the executive branch [depending on] the scope of discretion and the responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based.  It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good faith belief, that affords basis for qualified immunity of executive officers for acts performed in the course of official conduct.'") (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 247 (1974)).

[89] *Barkes*, 135 S. Ct. at 2044 (alteration in original) (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011)).

[90] *Id.* (quoting *al-Kidd*, 563 U.S. at 2083).

[91] *Id.* (second emphasis in original) (internal quotation marks omitted).

[92] *Howell v. Cataldi*, 464 F.2d 272, 281-82 (3d Cir. 1972) (alteration in original) (quoting *Weems v. U.S.*, 217 U.S. 349, 370 (1910); *Trop v. Dulles*, 356 U.S. 86, 101 (1958)).

legitimate penal] aim; that is, when a punishment is unnecessarily cruel in light of the purpose for which it is used."[93]

The DOC Defendants maintain the FAC does not plausibly plead that any of them engaged in a violation of clearly established law,[94] however, they do not dispute clearly established law forbids punishment for illness or deprivation of medical care. Supreme Court precedent supports the clearly established nature of those rights. In *Robinson*, the Court held a statute that made the "status" of drug addiction a criminal offence "inflicts a cruel and unusual punishment in violation of the Fourteenth Amendment."[95] In *Estelle v. Gamble*, the Court found "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment . . . whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in

---

[93] *Cataldi*, 464 F.2d at 281 (quoting *Jordan v. Fitzharris*, 257 F. Supp. 674, 679 (N.D. Cal. 1966) and citing *Weems*, 217 U.S. at 268; *Robinson v. California*, 370 U.S. 660, 667 (1962)).

[94] D.I. 33 at 11; D.I. 43 at 2.

[95] *Robinson*, 370 U.S. at 666-67; *id.* at 677 ("We would forget the teachings of the Eighth Amendment if we allowed sickness to be made a crime and permitted sick people to be punished for being sick. This age of enlightenment cannot tolerate such barbarous action.") (Douglas, J., concurring); *see also Harmelin v. Michigan*, 501 U.S. 957, 1023 (1991) (stating *Robinson* held the status of drug addiction cannot be made a crime) (citing *Robinson*, 370 U.S. at 666-67); *Manning v. Caldwell*, 900 F.3d 139, 144 (4th Cir. 2018) ("In *Robinson v. California*, the Supreme Court . . . [held] that states could not declare someone a criminal simply on account of his status.") (citing *Robinson*, 370 U.S. at 666-67); *Sterling v. Borough of Minersville*, 232 F.3d 190, 195 (3d Cir. 2000) (Punishing an individual based on his status would "be contrary to the Court's holding in *Robinson* . . . that the Eighth and Fourteenth Amendments forbid punishment of status as opposed to conduct."); *cf. U.S. v. MacEwan*, 445 F.3d 237, 249 n.11 (3d Cir. 2006) (stating that, unlike *Robinson*'s prohibition on statutes punishing the status of being an addict, MacEwan was punished for repeatedly violating federal laws prohibiting the receipt of child pornography).

intentionally denying or delaying access to medical care . . . ."[96] Therefore, punishment

for illness or deprivation of medical care violates clearly established law which is not

shielded by qualified immunity.[97]

The DOC Defendants do, however, argue that to the extent Clark pleads a claim

against any of them with respect to his placement in the SHU, the doctrine of qualified

immunity bars that claim because it is not based on a violation of clearly established

law.[98]  Clark disputes this argument.[99]

Clark appears to contend that housing an inmate with SMI for long periods of

---

[96] 429 U.S. 97, 104-05 (1976) (internal citation, quotation marks, and footnotes omitted); *id.*, 429 U.S. at 104 ("We . . . conclude that deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain.'") (quoting *Gregg v. Georgia*, 96 S. Ct. 2909, 2925 (1976)); *id.* at 106 ("In order to state a cognizable claim [of medical mistreatment under the Eighth Amendment], a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.").

[97] The DOC Defendants acknowledge "it is possible that [Clark's] mental illness and misconduct may be interrelated," however, they suggest "the much more plausible explanation is that [Clark] was punished for misconduct" and argue "there is no authority that clearly establishes that an inmate with mental illness cannot be placed in restrictive housing when he violates prison rules." D.I. 43 at 4.  The court does not read the FAC as alleging Clark was placed in the SHU for violating prison rules; he alleges he was placed there in retaliation for manifestations of his mental illness.  *See, e.g.*, D.I. 29, Count III at ¶ 2 (Defendants retaliated against Clark for his "mental illness and manifestations thereof."); D.I. 29 at ¶ 1 (Clark was placed in the SHU "in retaliation for [his] SMI, loud voice, or minor rule infractions . . . ."; *id.* at ¶¶ 37, 52 (same).  It is not proper for the court to weigh the plausibility of the DOC Defendants' characterization of Clark's allegations.  *See Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008) (stating a district court deciding a Fed. R. Civ. P. 12(b)(6) motion to dismiss is "required to accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the plaintiff]"); *cf. York Bldg. Prod. Co. v. Mumma*, No. 1:10-CV-1677, 2011 WL 13214367, at *3 (M.D. Pa. Aug. 9, 2011) (refusing to consider certain evidence on a motion to dismiss because, *inter alia*, such consideration "would require a determination of its reliability and weight, which would be inappropriate for the Court to conduct at this time").

[98] D.I. 33 at 11.

[99] D.I. 38 at 10-14.

time in solitary confinement is the clearly established law violated by the DOC

Defendants in connection with his placement in the SHU.[100]  Clark's contention relies

primarily on one Supreme Court case and one district court case.[101]

Clark points to the Supreme Court's statement over a century ago that solitary

confinement of sane prisoners, let alone the mentally ill, bears "a further terror and

peculiar ma[r]k of infamy," and that "[a] considerable number of the prisoners fell, after

even a short [solitary] confinement, into a semi-fatuous condition . . . and others

became violently insane; others, still, committed suicide."[102]

The statements in *In re Medley* have nothing to do with the question of whether

solitary confinement of sane, or mentally ill, prisoners constitutes cruel and unusual

punishment in violation of the Eighth Amendment.[103]  There, the Court considered an

---

[100] Although Clark does not expressly articulate the clearly established law purportedly violated, the court comes to its description from Clark's statement that:  "[i]t is well-established precedent that housing an inmate *without* SMI for long periods of time in solitary confinement has profound and horrific psychological effects on the prisoner."  D.I. 38 at 11 (emphasis added).  If it is "well-established" that housing a non-mentally ill prisoner in solitary confinement for long periods of time violates a prisoner's rights, it follows that Clark's position applies with greater force when a mentally ill prisoner is subjected to the same confinement.  Later in his brief, Clark provides the somewhat more succinct statement that:  "[e]xisting law clearly establishes that housing mentally ill prisoners in solitary violates the Eighth Amendment and the ADA, and that a prisoner cannot be punished for an illness or deprived of medical care," conflating his clearly-established-law arguments with regard to housing mentally ill inmates in the SHU, punishment for illness, and deprivation of medical care.  *Id.* at 13 (citing *Estelle*, 429 U.S. at 109; *Robinson*, 370 U.S. at 666-68; *Gomez*, 889 F. Supp. at 1266-67).

[101] *Id.* at 11.

[102] *Id.* (quoting *In re Medley*, 134 U.S. 160, 168, 170 (1890)).

[103] The first quotation cited by Clark is gleaned from "the statutory history of solitary confinement in the English law."  *In re Medley*, 134 U.S. at 170.  The second quotation is taken from the Court's review of the history of solitary confinement described in an encyclopedia.  *Id.* at 167-68. Other courts have concluded *In re Medley* does not speak to violations of the Eighth Amendment.  *See, e.g.*, *Gissendaner v. Comm'r, Ga. Dept. Corrs.*, 803 F.3d 565, 573 (11th Cir. 2015) (The plaintiff's reliance on

application for a writ of *habeas corpus* brought by a prisoner convicted of murder under a statute he alleged to be an *ex post facto* law.[104] "[T]he only question argued before us was whether the act of April 19, 1889 . . . under which the sentence complained of was imposed by the district court, is an *ex post facto* law, so as to be void under the provision of the constitution of the United States on that subject, and, if so, in what respect it is in violation of that constitutional provision."[105] Therefore, *In re Medley* fails to support Clark's argument that a reasonable official would have understood that housing an inmate with SMI in solitary confinement for long periods of time is a clearly established Eighth Amendment violation.[106]

---

*In re Medley* "for the proposition that uncertainty regarding one's execution may amount to 'cruel and unusual punishment' in violation of the Eighth Amendment . . . is patently false. The issue in *In re Medley* had nothing to do with the Eighth Amendment."); *U.S. v. Chandler*, 996 F.2d 1073, 1096 (11th Cir. 1993) (Because the Court's decision in *In re Medley* "rested on *ex post facto* grounds, it provides no support for Chandler's argument that his current situation is cruel and unusual punishment."); *State v. Chinn*, No. 16206, 1997 WL 464736, at *1 (Ohio Ct. App. Aug. 15, 1997) ("*Medley* . . . involved *ex post facto* legislation and not the Eighth Amendment's prohibition against cruel and unusual punishment.").

[104] *In re Medley*, 134 U.S. at 161-62.

[105] *Id.* at 162-63.

[106] A recent dissent from the Supreme Court's denial of review in a death penalty case alleging cruel and unusual punishment in violation of the Eighth Amendment tends to support this conclusion. In *Ruiz v. Texas*, the plaintiff spent most of his twenty-two years on death row in solitary confinement. 137 S. Ct. 1246, 1246 (2017) (Breyer, J., dissenting from denial of stay of execution of sentence of death). Justice Breyer noted the "serious objections" to extended solitary confinement recounted in *In re Medley* and that "a terrible 'human toll' is 'wrought by extended terms of isolation' and that '[y]ears on end of near-total isolation exact a terrible' psychiatric 'price.'" *Id.* at 1247 (alteration in original) (quoting *In re Medley*, 134 U.S. at 168; *Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring)). Justice Breyer quoted Justice Kennedy's suggestion in *Ayala*, that "'[i]n a case that present[s] the issue,' the Court should decide whether extended solitary confinement survives Eighth Amendment scrutiny" and stated his belief that *Ruiz* was "an appropriate case to conduct that constitutional scrutiny." *Id.* at 1247 (alterations in original) (quoting *Ayala*, 135 S. Ct. at 2210). The Court's denial of review in *Ruiz* precluded its constitutional scrutiny of a potential Eighth Amendment

Clark also relies on *Madrid v. Gomez* where, twenty-three years ago, the United States District Court for the Northern District of California found housing SMI prisoners in solitary confinement violates the Eighth Amendment.[107]  The *Gomez* court stated, for inmates with SMI, "placing them in the SHU is the mental equivalent of putting an asthmatic in a place with little air to breathe.  The risk is high enough, and the consequences serious enough, that we have no hesitancy in finding that the risk is plainly 'unreasonable.'"[108]

> [S]ubjecting individuals to conditions that are "very likely" to render them psychotic or otherwise inflict a serious mental illness or seriously exacerbate an existing mental illness can not be squared with evolving standards of humanity or decency, especially when certain aspects of those conditions appear to bear little relation to security concerns.  A risk this grave–this shocking and indecent–simply has no place in civilized society.[109]

Apart from the Supreme Court having not clearly established the right Clark posits, and the absence of *any* persuasive authority in the courts of appeals–much less a *robust consensus* among those courts on the issue–the single district court case cited by Clark does not address the question of whether housing SMI prisoners in solitary confinement is a clearly established violation the Eighth Amendment.[110]

The *Gomez* opinion never recites the phrase "qualified immunity" and does not

---

violation by extended solitary confinement and, therefore, left the question open.

[107] D.I. 38 at 11 (citing 889 F. Supp. 1146, 1266 (N.D. Cal. 1995) (confining SMI inmates to solitary confinement constitutes cruel and unusual punishment)).

[108] *Gomez*, 889 F. Supp. at 1265 (citing *Helling v. McKinney*, 113 S. Ct. 2475, 2481 (1993)).

[109] *Id.* at 1266.

[110] Both quotations from *Gomez* cited by Clark appear in a section titled "Whether conditions in the SHU are sufficiently injurious to mental health so as to deprive inmates of a basic necessity of life."  *Id.* at 1261-66.

specifically address that doctrine. There, the court considered a class action representing all prisoners incarcerated by the State of California Department of Corrections at Pelican Bay State Prison in which plaintiffs' alleged, *inter alia*, violations of the First, Eighth, and Fourteenth amendments of the United States Constitution, including violations relating to conditions of inmates held in solitary confinement.[111] The *Gomez* court found conditions in the implicated security housing unit violated Eighth Amendment standards with respect to certain categories of inmates, including the mentally ill.[112] Thus, *Gomez* determined whether certain constitution rights of prisoners were violated, not whether the particular right discussed was clearly established law in the context of a qualified immunity examination.

Likewise, the *Cataldi* opinion cited by Clark,[113] and the *Weems, Trop*, *Robinson*, and *Jordan* opinions cited therein, do not address the existence of clearly established law in a qualified immunity determination. For instance, *Cataldi*'s statement that the meaning of the Eighth Amendment's prohibition of cruel and unusual punishment must be drawn "'from the evolving standards of decency that mark the progress of a maturing society,'"[114] noted the evolution of what courts considered to be a violation of the Eighth Amendment; "'[t]he cruel and unusual punishment clause is a nonstatic, moral precept designed to curb treatment which offends contemporary standards of decency.'"[115]

The statement in *Weems* that "[w]hat constitutes a cruel and unusual punishment

---

[111] *Id.* at 1155-56.
[112] *Id.* at 1261, 1265.
[113] D.I. 38 at 10.
[114] *Howell v. Cataldi*, 464 F.2d 272, 282 (3d Cir. 1972) (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)).
[115] *Id.* at 280 (quoting *Anderson v. Nosser*, 438 F.2d 183, 190 (5th Cir. 1971)).

has not been exactly decided" precedes a lengthy discussion of the changes in Eighth Amendment jurisprudence.[116]  The *Trop* court's statement that "[t]he Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society" follows a citation to *Weems* where the Court first declared "a punishment of 12 years in irons at hard and painful labor imposed for the crime of falsifying public records . . . was cruel in its excessiveness and unusual in its character" and noted *Weems'* recognition "that the words of the Amendment are not precise."[117] Similarly, *Robinson* addressed the bounds of what constituted cruel and unusual punishment under the Eighth Amendment,[118] and *Jordan*'s statement that a punishment may be cruel and unusual when it "goes beyond what is necessary to achieve [a legitimate penal] aim" appears in a series of citations illustrating "three general approaches to the question" of what constitutes a cruel and unusual punishment.[119]

None of those cases addressed qualified immunity and none support Clark's position that housing a mentally ill inmate in solitary confinement for long periods of time violates a clearly established Eighth Amendment prohibition of cruel and unusual punishment.[120]  Consequently, the DOC Defendants are entitled to qualified immunity to

---

[116] *Weems*, 217 U.S. at 368-381.

[117] *Trop*, 356 U.S. at 100-01 (citing *Weems*, 217 U.S. at 377).

[118]  *See Robinson*, 370 U.S. at 667-68.

[119] *Jordan v. Fitzharris*, 257 F. Supp. 674, 679 (N.D. Cal. 1966).

[120] To the extent that Clark also relies on various studies, standards, and recommendations, e.g., those from the National Commission on Correctional Health Care, the American Psychiatric Association (D.I. 29 at ¶¶ 44-45), such materials do not demonstrate there is clearly established law concerning Clark's placement in the SHU. *Cf. Bell v. Wolfish*, 441 U.S. 520, 543 n.27 (1979) ("[W]hile the recommendations of . . . various groups may be instructive in certain cases, they simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question."); *Gary H. v. Hegstrom*, 831 F.2d 1430, 1433 (9th Cir. 1987) ("[T]he wholesale

the extent that in Count I Clark alleges an Eighth Amendment violation with respect to his placement in the SHU.

Next, the court addresses the DOC Defendants' contention that the FAC fails to plausibly plead facts that distinguish conduct allegedly taken by each defendant and how each one of the named defendants violated Clark's constitutional rights.[121]

First, however, the court addresses a novel argument Clark makes with regard to the specificity of facts required to be alleged to support his claims against the DOC Defendants. Although Clark maintains the FAC gives adequate notice to each defendant of the conduct, time, place, and persons involved in the alleged constitutional violations, he contends the specificity the DOC Defendants demand is not required by the law and not possible for someone like Clark to plead.[122]

Clark has schizophrenia and bipolar disorder.[123] He maintains the DOC Defendants' conduct in housing him in solitary confinement for extended periods of time further exacerbated his already serious mental illness.[124] He declares it is not legally required or reasonable that a mentally ill plaintiff like Clark recall with exacting detail the dates and times of events that occurred while he was in solitary confinement.[125]

---

adoption of various professional associations' concepts for model institutions as if they were constitutionally mandated was unwarranted. In [*Hoptowit*,] we held that it was error for the court to constitutionalize the standards of the American Medical Association and the American Public Health Association.") (citing *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982)).

[121] D.I. 33 at 7-9.
[122] D.I. 38 at 18.
[123] *Id.*; *id.* at 2 (citing D.I. 29 at ¶ 1 ("Mr. Clark has been diagnosed with [SMI], including manic depression and paranoid schizophrenia.")).
[124] *Id.* at 18.
[125] *Id.*

Clark contends the FAC comports with the latitude provided plaintiffs to plead on information and belief where "'the requisite factual information is peculiarly within the defendant's knowledge or control–so long as . . . *[p]laintiffs . . . accompany their legal theory with factual allegations that make their theoretically viable claim plausible.*'"[126]

Clark asserts the DOC Defendants cannot cause his severe mental damage and then use that damage to escape discovery of their actions.[127] He argues the specificity the DOC Defendants demand is available through discovery that he should be permitted to take of disciplinary, medical, and other records and information peculiarly within their control.[128]

Clark cites no precedent for the proposition that his SMI lessens the pleading requirements to state a § 1983 claim or opens the door to discovery to provide specificity to support such a claim. "Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."[129] Rule 12(b)(6) provides a procedure that "streamlines litigation by dispensing with needless discovery and factfinding."[130] A § 1983 plaintiff "must plead that each Government-official defendant,

---

[126] *Id.* at 19 (quoting *McDermott v. Clondalkin Grp., Inc.*, 649 F. App'x 263, 267-68 (3d Cir. 2016) (emphasis and second omission in original) (quoting *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002))). The DOC Defendants do not quarrel with Clark's pleading certain facts on information and belief: they contend the facts alleged lack the required specificity.

[127] *Id.*

[128] *Id.* (quoting *McDermott*, 649 F. App'x at 267-68).

[129] *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

[130] *Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989); *see also Brown v. Coupe*, C.A. No. 16-271-LPS, 2017 WL 1137466, at *4 (D. Del. Mar. 27, 2017) (finding a "[p]laintiff [is not] entitled to discovery in order to overcome a motion to dismiss") (citing *Iqbal*, 556 U.S. at 678-79).

through the official's own individual action, has violated the Constitution."[131]  "[T]he complaint [must] make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state."[132]  Although the court provides a measure of latitude to a *pro se* plaintiff's pleadings,[133] the FAC was filed months after Clark was appointed counsel.[134]

Because there is no support for Clark's argument that his SMI lessens the required pleading specificity, the court rejects that argument.  The court now examines the FAC to determine if it provides adequate notice to the DOC Defendants.

"Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that *each* Government-official defendant, through the official's own individual action, has violated the Constitution."[135]  In dismissing a party's generalized allegations against all defendants, the court in *Boone v. Salameh* stated:  "Plaintiff fails to specify how and when each individual Defendant violated his constitutional rights.  Instead, the

---

[131] *Iqbal*, 550 U.S. at 676.

[132] *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008) (emphasis in original) (citing *Twombly*, 127 S. Ct. at 1970-71 n.10).

[133] *See, e.g.*, *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (*per curium*) (stating "we hold [allegations of a *pro se* complaint] to less stringent standards than formal pleadings drafted by lawyers"); *Zilich v. Lucht*, 981 F.2d 694, 694 (3d Cir. 1992) ("When, as in this case, the plaintiff is a *pro se* litigant, we have a special obligation to construe his complaint liberally.") (quoting *Haines*, 404 U.S. at 520); *cf. Askew v. Jones*, 160 F. App'x 140, 143 (3d. Cir. 2005) (finding Eighth Amendment-based claim of deliberate indifference to a serious medical need conformed to the notice-pleading standard for *pro se* civil rights complaints) (citations omitted).

[134] D.I. 38 at 1 ("On September 12, 2017, the Court recognized the appointment of current counsel for Plaintiff. . . .  Mr. Clark filed [the FAC] on January 12, 2018 . . . .") (citing D.I. 29).

[135] *Iqbal*, 550 U.S. at 676 (emphasis added).

allegations lump all three Defendants together and state that they collectively failed to 'safeguard' his medical care."[136]

Clark names eight DOC Defendants and six Medical Defendants, however, the DOC Defendants note much of the FAC simply makes allegations against "Defendants" without distinguishing the acts of individual defendants.[137] They maintain little is pled as to how each senior manager violated Clark's rights and does not parse out how Carrothers, Burton, Rispoli, and Willey deprived him of his constitutional rights.[138] Because the FAC merely lumps together the purported activities of the DOC Defendants, and unspecified non-defendants, the FAC should be dismissed due to is purported failure to meed the requirements of *Iqbal* and *Twombly* and the Rule 8 fair notice requirements.[139]

Additionally, the DOC Defendants argue the FAC does not meet the

---

[136] *Boone v. Salameh*, C.A. No. 11-171, 2012 WL 1435555, at *4 (W.D. Pa. Mar. 28, 2012); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1249-50 (10th Cir. 2008) (Because "[i]n § 1983 cases, defendants often include the government agency and a number of government actors sued in their individual capacities[,] . . . it is particularly important in such circumstances that the complaint make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state. Count 1 of [the] complaint fails to isolate the allegedly unconstitutional acts of each defendant, and thereby does not provide adequate notice as to the nature of the claims against each.") (emphasis in original) (citing *Twombly*, 127 S. Ct. at 1970-71 n.10); *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) ("By lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct, [the plaintiff's] complaint failed to satisfy [the] minimum requirement [of fair notice]."); *Swim v. Hendrick*, No. CIV-12-480-D, 2013 WL 3992440, at *2 (W.D. Okla. Aug. 2, 2013) ("[W]ithout identifying the wrongful acts allegedly committed by each defendant, a pleading fails to satisfy both the *Twombly* plausibility requirement and the fair notice requirements of Rule 8.") (citing *Robbins*, 519 F.3d at 1250-51).
[137] D.I. 33 at 8.
[138] *Id.*
[139] *Id.*

requirements of *Iqbal* and *Twombly* to plead facts sufficient to support the contention that any of the DOC Defendants played a personal role in violating Clark's constitutional rights.[140]  They maintain the FAC pleads nothing that suggests the senior officials had any personal involvement or knowledge regarding the circumstances of Clark's detention or that any one of the other officers was personally involved in any deprivation of Clark's rights.[141]  They contend the FAC does not plead any specific facts or detail any specific incident in which any of the DOC Defendants were personally involved.[142]  They contend, therefore, these pleading deficiencies require the FAC be dismissed.[143]

The DOC Defendants also maintain that Clark's claims must fail to the extent he seeks to hold them liable for alleged violations related to his medical care.[144]  The FAC makes clear Clark was under the care of Connections Community Care, Inc., the prison medical provider.[145]

Taking the DOC Defendants' last argument first, the court agrees the FAC does not state a claim against them for deprivation of medical or mental health treatment.[146]

"If a prisoner is under the care of medical experts . . . , a non-medical prison

---

[140] *Id.*

[141] *Id.*

[142] *Id.* at 8-9.

[143] *Id.* at 9.

[144] *Id.*

[145] *Id.*  "The Medical defendants through Connections Community Care, Inc. were employed to administer health care at the JTVCC . . . ."  D.I. 37 at 4 (citing D.I. 29 at ¶¶ 28-33).

[146] Clark states both prison officials and medical staff violate the Eighth Amendment for failure to provide adequate health care.  D.I. 38 at 11.  Although this statement includes prison officials, as explained below, no claim or factual allegations in the FAC supports such violation as to the DOC Defendants.

official will generally be justified in believing that the prisoner is in capable hands."[147]

The *Spruill* court concluded that, "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eight Amendment scienter requirement of deliberate indifference."[148]

The DOC Defendant argue the FAC fails to plausibly plead that any of them were aware of deficiencies in Clark's medical or mental health care and it does not attempt to plead who knew what.[149] The DOC Defendants, therefore, urge the court to dismiss the FAC to the extent it attempts to impose liability for purported shortcomings in medical care.[150]

None of the FAC's four counts directly allege the DOC Defendants violated Clark's rights by denying appropriate medical or mental health care. Count I alleges an Eight Amendment violation against "Defendants" relating to Clark's placement in the SHU, which the court has found the DOC Defendants are shielded from by qualified immunity. Count II addresses Clark's purportedly inadequate medical care and is specifically alleged as to the Medical Defendants. That count, therefore, does not apply to the DOC Defendants. Count III alleges retaliation for, *inter alia*, requesting medical treatment and Clark's mental illness and manifestations thereof against "Defendants," which pertains to the decision to place Clark in solitary confinement. Count IV avers a procedural due process violation for placement in solitary confinement without due

---

[147] *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004).
[148] *Id.*
[149] D.I. 33 at 9.
[150] *Id.*

process and is specifically alleged as to the DOC Defendants.

Neither the complaint's supporting factual allegations, nor Clark's arguments based thereon, support a claim that the DOC Defendants violated Clark's right to appropriate medical or mental health treatment.

In his opposition brief's statement of facts section addressing failure to provide Clark with mental health counseling while housed in the SHU, Clark cites allegations that he had no access to therapy sessions, and only saw a mental health provider who evaluated his medications through a glass window once every few months.[151]  After then listing the needs of SMI prisoners, Clark states, "[t]he Medical [D]efendants failed to provide these services to Mr. Clark in solitary confinement."[152]  He cites allegations concerning review by mental health staff of SMI prisoners and DOC Policy Manual requirements concerning placement of prisoners in solitary confinement, referral to mental health personnel, and the monitoring of SMI-housed prisoners.[153]  Other citations are directed at purported rule violations in *determining whether an inmate should be placed* in solitary confinement (which do not implicate a failure to *provide* medical or mental health treatment), and the failure to properly monitor and evaluate Clark in accordance with the DOC's Policy Manual (which implicate the actions the Medical Defendants and not the DOC Defendants).[154]  He describes another unit for SMI prisoners alleged to be more appropriate for their restrictive housing, and his potential placement at the Delaware Psychiatric Center ("DPC"), which could have provided

---

[151] D.I. 38 at 7 (citing D.I. 29 at ¶¶ 41-42).
[152] *Id.*
[153] *Id.* at 8 (citing D.I. 29 at ¶¶ 71-72, 74).
[154] *Id.* at 9 (citing D.I. 29 at ¶¶ 73, 75).

appropriate treatment.[155]  Denial of such alternative housing allegedly demonstrates actionable deliberate indifference to the harm Clark suffered.[156]

The pertinent portion of the argument section in his opposition brief is titled "The FAC Alleges the DOC Defendants Had Knowledge of and Acquiescence in the DOC's Practice of Housing Mr. Clark in Solitary Confinement Because of His Mental Illness."[157] Clark's argument focuses on his placement in the SHU, and the reasons for, and duration of, that placement.  He states "[t]he DOC [D]efendants prevented Mr. Clark from receiving any mental health counseling while in the SHU."[158]  The FAC paragraphs cited in support of this statement specifically name certain of the Medical Defendants[159] and allege deficiencies in monitoring and evaluating Clark, and that cell-front visits do not comply with the DOC Policy Manual's privacy standards.

The court concludes, therefore, that to the extent Clark claims the DOC Defendants are liable for failure to provide adequate medical or mental health treatment, those claims are dismissed.

Finally, the court addresses Clark's claim that the FAC adequately alleges the DOC Defendants had knowledge of and acquiesced in the DOC's practice of housing Clark in solitary confinement because of, and in retaliation for, his mental illness and in

---

[155] *Id.* (citing D.I. 29 at ¶ 79).
[156] *Id.* at 9-10 (citing D.I. 29 at ¶ 80).
[157] *Id.* at 14; *id.* at 15-16 ("The FAC more than adequately pleads that each defendant was aware of and acquiesced in or participated in the DOC's policy of housing Mr. Clark, and many other seriously mentally ill inmates like him, in the SHU as a punishment for their SMI despite the known risk of such conduct.").
[158] *Id.* at 17 (citing D.I. 29 at ¶¶ 64, 75-76).
[159] D.I. 29 at ¶ 64.

violate of his due process rights.[160]

A plaintiff states a claim for deliberate indifference by showing that a defendant-official "had been exposed to information concerning the risk and thus 'must have known' about it, [because] such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk."[161]  Because "obviousness of risk alone can be sufficient to survive summary judgment and to establish actual knowledge at trial;  *fortiori*, it is sufficient to give rise to an inference of actual knowledge at the pleading stage."[162]  A plaintiff "may state a claim against a supervisor for deliberate indifference based upon the supervisor's knowledge of and acquiescence in unconstitutional conduct by his or her subordinates."[163]

"In addition to demonstrating that the [government's] policy or custom played an affirmative role in the constitutional deprivation," a plaintiff shows deliberate indifference by showing a failure to act that occurs against "a background of events and circumstances which establish that the policy of inaction is the functional equivalent of a decision by the [state actor] itself to violate the constitution."[164]  "[A]cquiescence in a long-standing practice or custom that constitutes the standard operating procedure of the . . . governmental entity" is grounds for holding a state actor liable.[165]

---

[160] D.I. 38 at 14; D.I. 29 at ¶ 48-50.

[161] *Hamilton v. Leavy*,  117 F.3d 742, 747-48 (3d Cir. 1997) (quoting *Farmer v. Brennan*, 511 U.S. 825, 842-43 (1994)).

[162] *Kedra v. Schroeter*, 876 F.3d 424, 445 n.16 (3d Cir. 2017).

[163] *Starr v. Baca*, 652 F.3d 1202, 1206-07 (9th Cir. 2011).

[164] *Thomas v. Bd. of Educ.*, 759 F. Supp. 2d 477, 490 (D. Del. 2010) (quoting *City of Canton v. Harris*, 489 U.S. 378, 394-95 (1989) (O'Connor, J concurring)).

[165] *Harris*, 489 U.S. at 394-95; *id* at 491 (alleging conscious disregard of "a known or obvious consequence of his action" is sufficient to state a claim of deliberate indifference against a defendant) (internal quotation marks and citations omitted)

Count III (Retaliation) of the FAC alleges:

Defendants violated Mr. Clark's First and Fifth Amendment rights as applied to the State through the Fourteenth Amendment by their actions as alleged and described in this FAC, in retaliating against Mr. Clark and conspiring in and furthering such retaliation for, among other things, (i) requesting medical treatment, (ii) requesting for explanations of why he was in the SHU, (iii) mental illness and manifestations thereof, and (iv) providing information and assistance in the 2006 DOJ Investigation.[166]

Count IV (Procedural Due Process Violation for Placement in Solitary

Confinement without Due Process) of the FAC, the only count specifically addressed to

the DOC Defendants, alleges:

The DOC Defendants' transfer of Mr. Clark to a solitary confinement cell constitutes an atypical and significant hardship on Mr. Clark.

The DOC Defendants failed to follow DOC Policy for such a transfer, contradicting Mr. Clark's security classification, and providing no explanation for the reasons for the transfer or an opportunity for Mr. Clark to be heard or to consult with counsel prior to additional time in restrictive housing.

The DOC Defendants' conduct violates Mr. Clark's right to due process under the Fifth and Fourteenth Amendments of the United States Constitution.[167]

In support of his claims, Clark alleges:

As a result of consistently being housed for long periods of time in the SHU, Mr. Clark experienced increased hallucinations, paranoia, sel-mutilation, sleeplessness, and nightmares. Prison officials frequently regarded these manifestations of disease as prison rule infractions, which resulted in additional time in solitary confinement and further limitations on privileges, such as reduced phone time and visitation privileges.[168]

The warden has the power to control and veto any decision on status,

---

(internal quotation marks and citation omitted)).
  [166] D.I. 29, Count III at ¶ 2.
  [167] *Id.*, Count IV at ¶¶ 4-6.
  [168] *Id.* at ¶ 12

including housing status, for an inmate. The DOC Commissioner controls overall policy and management of the prison, including the practice of housing Mr. Clark in the SHU in response to and retaliation for using a loud voice, minor infractions, and manifestations of his mental illness.[169]

The DOC Defendants would frequently sanction [him] merely for talking in a loud voice, regardless of the content of his speech or his intent, and with knowledge that [he] has a hearing problem.[170]

Prior to placing Mr. Clark in the SHU, Defendants engaged in no due process or any procedure giving [him] the opportunity to be heard or consult with counsel."[171]

Defendants' policy and practice of placing and keeping SMI prisoners like Mr. Clark in the SHU because of their mental illness defeats the goals of proper mental health treatment, rehabilitation, and successful reintegration into society upon release from prison.[172]

Clark contends the FAC sets forth numerous facts establishing defendants' violation of his constitutional rights and that each defendant was aware of and acquiesced in or participated in the DOC's policy of housing Clark, and many other seriously mentally ill inmates like him, in the SHU as a punishment for their SMI despite the known risk of such conduct.[173] Clark further contends the FAC alleges "a background of events and circumstances which establish that the policy of inaction is the functional equivalent of a decision by the [state actor] itself to violate the Constitution."[174]

Clark maintains the FAC has factual allegations–including the ACA study, the

---

[169] *Id.* at ¶ 52.
[170] *Id.* at ¶ 53.
[171] *Id.* at ¶ 54.
[172] *Id.* at ¶ 78.
[173] D.I.38 at 15-16 (citing D.I. 29 at ¶¶ 4, 67).
[174] *Id.* at 16 (quoting *Thomas*, 759 F. Supp. 2d at 490).

APA and NCCHC standards, and the DOJ Agreement–that make his claims plausible.[175] In addition, the CLASI settlement shows the DOC was forced to make changes to its long-standing policy of disciplining inmates because of their SMI symptoms and keeping prisoners for months in solitary in the wake of the deadly riot at JTVCC in 2016, and to avoid further litigation by CLASI.[176]

Clark maintains the FAC adequately pleads the role of each named defendant in violating his constitutional rights.[177] The FAC names only those who were directly involved in the unlawful actions of putting and keeping Clark in solitary confinement for seven months, and supervisors who acted in accordance with the DOC's policy of housing SMI prisoners in the SHU, or acted in a manner that was deliberately indifferent to Clark's Eighth Amendment rights.[178]

Clark identified Carrothers, Burton, Rispoli, and Willey as the DOC officials who physically placed and kept him in the SHU, acting with full knowledge of the DOC's policy of punishing SMI prisoners with incarceration in the SHU instead of providing basic mental health care, and with deliberate indifference to the known risk to Clark's mental health and stability.[179] Clark identifies these defendants and defendants Coupe, Phelps, and Pierce as participants in the DOC's long-standing policy of housing Clark and hundreds like him in solitary confinement because of mental illness, despite the known risk to these vulnerable prisoners.[180]

---

[175] *Id.*
[176] *Id.* (citing D.I. 33, Ex. A).
[177] *Id.*
[178] *Id.*
[179] *Id.* at 16-17 (citing D.I. 29 at ¶¶ 4, 52, 66-67, 70, 78, 90-98).
[180] *Id.* at 17 (citing, e.g., D.I. 29 at ¶¶ 52, 78).

The FAC also states that Pierce participated in the ACA study in November 2015, and "was not 'open to change in regards to restrictive housing objective and classification concerning the mentally ill,' and that Pierce several times noted his authority 'to over-ride decision on classification and/or mentally ill treatment decisions.'"[181] Clark alleges these defendants implemented or acquiesced in the DOC's policy, kept him completely isolated, denied him adequate medical and mental health care, and prohibited him from working, participating in educational or rehabilitative programs, or attending religious services.[182] Clark further alleges:

> DOC defendants Carrothers, Burton, Rispoli, and Willy [sic], with the direction, acquiescence, and approval of their superiors, not only placed him in the SHU but retaliated against him while he was in the SHU for manifestations of his SMI, requests for medical attention, and requests for explanations for why he was being held for so many months in the SHU. The defendants extended the length of time Mr. Clark was locked in solitary confinement or confined him to the "naked room" as further punishment.[183]

Punishment for being mentally is a constitutional violation.[184] The DOC Defendants do not dispute that sanctioning an inmate *because of* mental illness is a constitutional violation.[185] Instead, they focus their argument on the FAC's purported

---

[181] *Id.* (citing D.I. 29 at ¶ 94).
[182] *Id.* (citing D.I. 29 at ¶¶ 4, 52, 66-67, 70).
[183] *Id.* (citing, e.g., D.I. 29 at ¶¶ 52-58, 67-69, 107).
[184] *Robinson*, 370 U.S. 370 U.S. 660, 666-67 (1962) (Making the "status" of being a drug addict a criminal offence "inflicts a cruel and unusual punishment in violation of the Fourteenth ; *id.* at 677 ("We would forget the teachings of the Eighth Amendment if we allowed sickness to be made a crime and permitted sick people to be punished for being sick. This age of enlightenment cannot tolerate such barbarous action.") (Douglas, J., concurring).
[185] The DOC Defendants maintain Clark was punished for misconduct, which they posit may be related to his mental illness, not for his mere status of being mentally ill. D.I. 43 at 4.

lack of specificity as to the involvement, knowledge, or acquiescence on the part of each defendant.[186]

The court disagrees and finds it plausible that each of the DOC Defendants are and were aware of Clark's mental illness. The FAC alleges "[a]ll defendants are and were aware of Mr. Clark's SMI by virtue of [his] treatment for SMI while under the care of the DOC since at least 2006."[187] Clark was housed in solitary confinement at various times during his incarceration, including for seven months from January to August 2016.[188] The DOC's Policy Manual requires prison officials to review a prisoner's medical record for mental health conditions prior to or within one hour of placement in solitary confinement.[189] They must identify prisoners with serious mental illness, and prior to placement in solitary confinement, refer immediately to mental health personnel prisoners who, like Clark, have received any treatment in the past five years for serious mental illness.[190] They must also conduct an assessment of the prisoner in a private setting within twenty-four hours of a mentally ill prisoner's placement in solitary confinement; and after completing the assessment, review the disciplinary charges against the prisoner, and evaluate what role the prisoner's mental illness played in his or her conduct.[191]

The court finds the foregoing adequate to plausibly allege that each of the named

---

[186] D.I. 43 at 4.
[187] D.I. 29 at ¶ 81; *id.* at ¶ 5 ("Defendants are well-aware of Mr. Clark's serious mental illness. He has been treated for schizophrenia and bipolar disorder while incarcerated in DOC facilities since at least 2006, if not earlier.").
[188] *Id.* at ¶ 11.
[189] *Id.* at ¶ 72.
[190] *Id.*
[191] *Id.*

defendants were aware of Clark's mental illness, were involved in the alleged constitutional violations, and that the FAC adequately alleges a background of events and circumstances plausibly demonstrating the supervising DOC Defendants, with the exception of Metzger,[192] were deliberately indifferent based upon their knowledge of and acquiescence in those violations. Therefore, the DOC Defendants' motion to dismiss Count III is denied, except as to Metzger which is granted as to him.

The DOC Defendants do not directly address Clark's contention in Count IV that his due process rights were violated when he was placed in solitary confinement. That count alleges, *inter alia*, that the DOC Defendants did not follow DOC policy in placing Clark in solitary confinement, and that he was not provided any explanation of the reasons for that placement or an opportunity to be heard or consult with counsel prior to additional time in restrictive housing.[193] As Clark's due process allegations are not rebutted, the DOC Defendants' motion to dismiss Count IV is denied except, again, as to Metzger which is granted as to him.[194]

### B.    Medical Defendants' Motion to Dismiss

---

[192] Metzger was not the Warden of JTVCC at the time of the alleged violations. The FAC alleges Metzger is the current Warden and Pierce was Warden until February 2017, after the 2016 period of Clark's confinement in the SHU. D.I. 29 at ¶¶ 22-23. Clark acknowledges the FAC inadvertently names Metzger where it should have named his predecessor Pierce in paragraph 97. D.I. 38 at 19 n.2.

[193] D.I. 29, Count IV.

[194] Although the FAC is dismissed as to Metzger with respect to the four asserted counts, he is not completely dismissed from the case as the FAC seeks declaratory and injunctive relief seeking Clark not be confined to the SHU, and that he be properly evaluated and placed in alternative housing should segregation from the general population be required. The court agrees with Clark that there is a fact question as to whether Metzger, in his official capacity as warden of the JTVCC, will guarantee the protection Clark seeks should he ultimately prevail on his declaratory and injunctive remedies. *See* D.I. 38 at 19 n.1.

Lynch is head of medical services at JTVCC.[195]  Muñoz is a psychologist,[196] Yunis is a psychiatrist,[197] and Montgomery, Mumford, and Johnson are nurse practitioners, all who provide medical care to inmates at JTVCC.[198]

The Medical Defendants move to dismiss Clark's complaint for failure to state a 42 U.S.C. § 1983 claim because:  (1) to state a civil rights claim, the plaintiff must plead with appropriate particularity the conduct, time, place, and person(s) responsible for the alleged violation; (2) the Eighth Amendment only requires that inmates be provided with minimally adequate medical care; (3) the claims against the Medical Defendants fail to plead exactly what each individual did to manifest a deliberate indifference to Clark's SMI, when they did it, and their requisite state of mind; (4) the claims against Yunis, Montgomery, Mumford, and Johnson are insufficient to state a claim of deliberate indifference; (5) plaintiff fails to adequately plead that Lynch and Muñoz knowingly participated in the alleged denial and mistreatment; and, (5) the Medical Defendants have no control over the classification and housing of inmates.[199]

Clark argues the Medical Defendants' motion to dismiss be denied because:  (1) the FAC adequately pleads that the Medical Defendants demonstrated deliberate indifference to the known risk of serious harm to Clark and, (2) the Medical Defendants cannot escape discovery because Clark is mentally ill.[200]

---

[195] D.I. 29 at ¶ 28.
[196] D.I. 29 at ¶ 29.
[197] D.I. 29 at ¶ 30.
[198] D.I. 29 at ¶¶ 31-33.  All Medical Defendants are alleged to be state actors for the purposes of the Fourteenth Amendment.  D.I. 29 at ¶¶ 28-30.
[199] D.I. 35 at 8-14.
[200] D.I. 37 at 10-17.

Clark's argument that the Medical Defendants cannot escape discovery because he is mentally ill[201] is the identical verbiage used in opposing the DOC Defendants' motion to dismiss.[202]  The court rejects these arguments for the same reasons discussed with respect to the DOC Defendants' motion to dismiss.  Thus, the court must determine whether the FAC adequately pleads facts to support his § 1983 claims against the Medical Defendants under established pleading requirements.

The Eighth Amendment's proscription against cruel and unusual punishment mandates that incarcerated offenders receive adequate medical care.[203]  Adequate medical care does not mean a prisoner is entitled to "unqualified access to health care . . . ."[204]  "'[M]ere disagreement as to the proper medical treatment' does not 'support a claim of an eighth amendment violation' . . . ."[205]

"In order to state a cognizable claim" of inadequate medical care, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."[206]  Prison medical authorities are afforded "considerable

---

[201] *Id.* at 16-17.

[202] *Compare id.* at 17, *with* D.I. 38 at 18-19.  The Medical Defendants respond to Clark's argument that he cannot plead facts "peculiarly within the defendant's knowledge," D.I. 40 at 4 (quoting D.I. 37 at 17), by noting "[t]he pertinent information regarding his mental health treatment is documented in his medical records and could have been obtained with a subpoena or a request to the DOC Defendants' counsel."  *Id.* (footnote omitted).

[203] *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

[204] *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

[205] *Pearson v. Prison Health Servs.*, 850 F.3d 526, 535 (3d Cir. 2017) (quoting *Monmouth Cty. Corr. Inst. v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987)).

[206] *Estelle*, 429 U.S. at 106; *Rouse*, 182 F.3d at 197 (To succeed on such claims, a plaintiff must allege plausible acts or omissions "(1) that the defendants were deliberately indifferent to [his] medical needs and (2) those needs were serious.") (citing *Estelle*, 429 U.S. at 106).

latitude . . . in the diagnosis and treatment of the medical problems of inmate patients."[207]  Deliberate indifference "has been likened to conduct that includes recklessness or a conscious disregard of a serious risk."[208]  This can be shown when a medical provider "(1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment."[209]  However, "'[w]here a prisoner . . . receive[s] some medical attention and the dispute is over the adequacy of treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.'"[210]

"[U]nder a supervisory theory of liability . . . personal involvement by a defendant remains the touchstone for establishing liability for the violation of a plaintiff's constitutional right."[211]  "[L]iability cannot be predicated solely on the operation of

---

[207] *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979)).

[208] *Rouse*, 182 F.3d at 197 (citing *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)). An Eighth Amendment plaintiff states a claim that state actors were deliberately indifferent to a prisoner's serious medical needs by alleging they "had been exposed to information concerning the risk and thus 'must have known' about it, [because] such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk."  *Farmer*, 511 U.S. at 842-43 (1994).

[209] *Rouse*, 182 F.3d at 197.

[210] *U.S. ex rel. Walker v. Fayette Cty., Pa.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979) (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)); *see also Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993) ("Although prison systems have a duty to provide prisoners with adequate medical care, . . . the law is clear that simple medical malpractice is insufficient to present a constitutional violation." (citing *Estelle*, 429 U.S. at 104, 106).

[211] *Thorpe v. Little*, 804 F. Supp. 2d 174, 184-85 (D. Del. 2011) (footnote omitted) (citing *Williams v. Lackawanna Cty. Prison*, Civ. No. 07-1137, 2010 WL 1491132, at *5 (M.D. Pa. Apr. 13, 2010)).  "'Supervision' entails, among other things, training, defining expected performance by promulgating rules or otherwise, monitoring adherence to

*respondeat superior.*"[212]  "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence . . . made with appropriate particularity."[213]  Therefore, the plaintiff must allege "the conduct, time, place, and persons responsible" for the alleged harm.[214]  "Alleging a mere hypothesis that an individual defendant had personal knowledge or involvement in depriving the plaintiff of his rights is insufficient to establish personal involvement."[215]  Allegations of misconduct against a collective group of defendants are insufficient to satisfy the particularized pleading standards for civil rights claims.[216]

---

performance standards, and responding to unacceptable performance whether through individualized discipline or further rulemaking.  For the purpose of defining the standard for liability of a supervisor under § 1983, the characterization of a particular aspect of supervision is unimportant."  *Sample v. Diecks*, 885 F.2d 1099, 1116 (3d Cir. 1989).

[212] *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (citing *Parratt v. Taylor*, 451 U.S. 527, 537 n.3 (1981); *Hampton v. Holmesburg Prison Officials*, 546 F.2d 1077, 1082 (3d Cir. 1976)).  Clark does not argue a theory of respondeat superior, instead, he alleges the Medical Defendants participated or acquiesced in a custom or practice that violated his constitutional rights.  D.I. 37 at 2.  State actors "may be directly subject to section 1983 liability as a result of an official policy or custom."  *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1059 (3d Cir. 1991) (citing *Monell v. Dept. of Social Servs. of City of New York*, 436 U.S. 658, 694 (1978) ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.")).

[213] *Rode*, 845 F.2d at 1207 (citations omitted).

[214] *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (citing *Boykins v. Ambridge Area Sch. Dist.*, 621 F.2d 75, 80 (3d Cir. 1980)).

[215] *Naugle v. Franklin Cty. Prison*, C.A. No. 1:10-CV-2029, 2011 WL 3271200, at *3 (M.D. Pa. July 29, 2011) (citing *Rode*, 845 F.2d at 1208).

[216] *Robbins v. Oklahoma*, 519 F.3d 1242, 1249-50 (10th Cir. 2008) (citing *Twombly*, 127 S. Ct. at 1970-71 n.10); *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) ("By lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct, [the plaintiff's] complaint failed to satisfy [the] minimum requirement [of fair notice]."); *cf. Shabazz v. Connections Cmty. Support Programs, Inc.*, C.A. No. 16-570-RGA, 2017 WL 5714000, at *2 (D. Del. Nov. 28, 2017) (dismissing claims alleging deliberate indifference to a serious medical need where plaintiff did not adequately allege the "'conduct, time, place, and persons responsible'"

"'[A]cquiescence in a long-standing practice or custom' that 'constitutes the standard operating procedure of the local governmental entity'" is grounds for holding a state actor liable.[217] Where employees and supervisors engage in a custom or course of conduct that denies medical care to a prisoner, the supervisors "may be held liable for the constitutional torts of [their] employees."[218]

Clark contends the FAC adequately pleads deliberate indifference to the proper evaluation of his mental health, the lack of mental health counseling in the SHU, and that he was administered harmful medications.[219]

To state a cognizable claim that Clark's medical needs were not adequately met, he "must demonstrate (1) that the defendants were deliberately indifferent to [his] medical needs and (2) those needs were serious."[220]

Clark alleges he has been diagnosed with SMI of which the Medical Defendants were aware as evidenced by his treatment for those conditions while incarcerated.[221] The Medical Defendants do not dispute Clark's diagnosis, their awareness of that diagnosis, or the related seriousness of his medical needs. Thus, the court examines allegations of deliberate indifference to his medical needs.

_____

for his alleged harm) (quoting *Evancho v. Fisher*, 523 F.3d 347, 353 (3d Cir. 2005)).

[217] *Thomas v. Bd. of Educ.*, 759 F. Supp. 2d 477, 490 (D. Del. 2010) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 727 (1989).; *id.* at 490-91 ("Deliberate indifference lies somewhere between the poles of negligence at one end and purpose and knowledge at the other. It is a stringent standard, in which a [government actor] must consciously disregard a known or obvious consequence of his action.") (citations and internal quotation marks omitted).

[218] *Lamb v. Taylor*, C.A. No. 08-324 GMS, 2009 WL 866793, at *3 (D. Del. Mar. 31, 2009)).

[219] D.I. 37 at 10-16.

[220] *Rouse*, 182 F.3d at 197 (citing *Estelle*, 429 U.S. at 106).

[221] D.I. 29 at ¶¶ 1, 5, 64, 76, 81.

Count II, the only count specifically addressed to the Medical Defendants, alleges

they "misus[ed] their power and demonstrat[ed] deliberate indifference to his serious

medical needs [which] caus[ed] substantial deprivation and lasting harm."[222]  This is

purportedly shown by their:  (1) participation in decisions related to Clark's placement in

the SHU; (2) administering medications to which he was allergic; and (3) failing to

provide adequate counseling.[223]

Clark contends his rights were violated in connection with the decision to place

him in the SHU.  The FAC alleges:

> The DOC defendants used solitary confinement in the SHU as a substitute
> for providing Mr. Clark with proper mental healthcare, and Defendants
> failed to take other reasonable measures to ameliorate the risk of serious
> harm to Mr. Clark.  Defendants had knowledge of the risks these
> deficiencies pose to Mr. Clark's mental illness.  Nevertheless, they
> permitted them to continue.[224]

Although paragraph 14 makes allegations directed at the DOC Defendants, paragraph

67 implicates the Medical Defendants in the decision to house Clark in the SHU:

> *Defendants* kept Mr. Clark in solitary confinement for months at a time,
> inflicting cruel and unusual punishment, even though it is well known to
> corrections and *medical professionals* throughout the United states–as the
> National Commission on Correctional Health Care ("NCCHC") and APA
> standards demonstrate–that extended periods of solitary confinement
> exacerbate the symptoms of mental illness for prisoners and result in
> further deterioration of their mental health.[225]

Paragraph 118 explicitly alleges:  "*The Medical Provider defendants participated in the*

*decisions to place and keep Mr. Clark in the SHU* for exorbitant periods of time, causing

---

[222] *Id.* at ¶ 116.
[223] *Id.* at ¶¶ 117-19.
[224] *Id.* at ¶ 14.
[225] *Id.* at ¶ 67.

him serious harm as described herein."[226]  The Medical Defendants did not participate in the decision to place Clark in the SHU, or the length of time he was housed there.

This is not, as Clark argues, "a fact outside the pleadings and a matter for discovery."[227]  The FAC states "[t]he warden has the power to control and veto any decision on status, including housing status, for an inmate.  The DOC Commissioner controls overall policy and management of the prison, including the practice of housing Mr. Clark in the SHU . . . ."[228]  Clark cites Sections 6516 and 6517 of Title 11 of the Delaware Code in his description of prison officials' responsibilities.[229]  Section 6516 recites:  "*[t]he Commissioner* shall assume full and active charge of *the Department*, its facilities and services, and is the chief executive and administrative officer of the

_____

[226] *Id.* at ¶ 118 (emphasis added); *see also id.* at ¶¶ 99-100 ("[Lynch and Muñoz] . . . participated in the decisions to keep Mr. Clark in the SHU for long periods of time . . . in collaboration with the other Medical Provider defendants and DOC defendants."); *id.* at ¶¶ 101-04 ("[Yunis, Montgomery, Mumford, and Johnson] . . . made decisions to keep [Clark] in the SHU for long periods of time in collaboration with the other Medical Provider defendants and DOC defendants.").

[227] D.I. 37 at 11 (citing *Purdue Pharmas. L.P. v. Mylan Pharms. Inc.*, C.A. No. 15-1155-RGA-SRF, 2017 WL 2569604, at *1 (June 13, 2017), a patent case where the court concluded that whether the claims of a previously-litigated patent were sufficiently identical to certain asserted patent claims was "a question of fact not appropriately resolved on a motion to dismiss.").  Clark's claim of deliberate indifference to his medical needs rests on the purported inadequacy of his treatment rather than the Medical Defendants' alleged role in deciding to place him in the SHU.  *See* D.I. 37 at 11 (The Medical Defendants' arguments regarding their participation in Clark's solitary confinement "misses the point . . . [a]s none of the Medical defendants followed the procedures . . . for the evaluation and monitoring of Mr. Clark as a SMI prisoner in SHU.  *Whatever their role in housing decisions*, the Medial defendants failed to provide" needed treatment or conduct required evaluations.) (emphasis added).

[228] D.I. 29 at ¶ 52.

[229] *See id.* at ¶ 88 ("Defendants Coupe and Phelps are statutorily authorized and responsible for the oversight, operation, and administration of Delaware's correctional system and the Delaware Prisons." (citing 11 *Del. C.* §§ 6516, 6517)).

Department."[230]  Pursuant to 11 *Del. C.* 6517, "*[t]he Commissioner* shall carry out and provide for: . . . (3) The custody, study, training, treatment, correction and rehabilitation *of persons committed to the Department.*"[231]

When considering a motion to dismiss, it is also proper to take judicial notice of relevant law not cited in the FAC.[232]  Section 6535 of the Delaware Code provides:  "*The Department* shall promulgate rules and regulations for the maintenance of good order and discipline in the facilities and institutions of the Department, including procedures for dealing with violations."[233]  This court has recognized "[s]ection 6535 . . . provides the authority to *prison officials* to establish administrative and disciplinary rules and procedures."[234]  Section 6536 addresses the medical care of inmates in Delaware.  It requires that "*[t]he Department* . . . promulgate reasonable standards, and . . . establish

---

[230] 11 *Del. C.* § 6516 (emphasis added).

[231] 11 *Del. C.* § 6517 (emphasis added).

[232] *See Schwarz v. Commonwealth Land & Title Ins. Co.*, 374 F. Supp. 564, 578 (E.D. Pa. 1974) ("Undoubtedly, certain matters outside the pleadings are cognizable on [a] motion to dismiss. . . .  This includes the statutes of Pennsylvania.") (citations omitted); *see also Lamar v. Micou*, 114 U.S. 218, 223 (1885) ("The law of any state of the Union, whether depending upon statues or upon judicial opinions, is a matter of which the courts of the United States are bound to take judicial notice, without plea or proof.") (citations omitted); *Gallup v. Caldwell*, 120 F.2d 90, 93 (3d Cir. 1941) ("The rule [is] well established that federal courts in exercising original jurisdiction may take judicial notice of the law of every state.").

[233] 11 *Del. C.* § 6535 (emphasis added).

[234] *Blizzard v. Watson*, 892 F. Supp. 587, 593 (D. Del. 1995) (emphasis added); *id* at 597 ("*[P]rison officials* may reclassify or transfer a prisoner from the general population to the ASDA[, Administrative Segregation and Detention Area,] for any reason or no reason at all.  The only limitation placed on this discretion is that the classification may not be based on race, religion or the exercise of a protected free speech right.") (emphasis added) (citing *Block v. Potter*, 631 F.2d 233, 237 (3d Cir. 1980)); *cf. Fletcher v. Phelps*, Civ. No. 12-489-SLR, 2012 WL 3150529, at *6 (D. Del. Aug. 1, 2012) ("The court has no authority to dictate plaintiff's housing assignment or prison classification.  These determinations are made by *prison authorities* as part of the administration of the prison.") (emphasis added).

reasonable health [and] medical . . . services, for each institution, including preventative, diagnostic and therapeutic measures . . . ."[235]  That section does not prescribe any role for medical providers in the housing or classification determinations of inmates. Therefore, the claim that any of the Medical Defendants violated Clark's rights by participating in the decision to house him in the SHU is dismissed.[236]

The FAC alleges the Medical Defendants "demonstrat[ed] deliberate indifference to [Clark's] serious medical needs" because, "[r]ather than providing [him] with the counseling he needs and proper medication for his SMI, the Medical Provider defendants administered the wrong medications knowing Mr. Clark was allergic and suffering profound adverse side effects."[237]

The FAC alleges the following with respect to the administered medications:

Defendants with deliberate indifference ignored Mr. Clark's need for and denied his requests for . . . proper medication, causing [him] serious harm.[238]

The Medical Provider defendants consistently gave Mr. Clark deleterious medications . . . .;[239]

While Mr. Clark was in the SHU, Defendants . . . [gave him] medications mental health staff knew caused serious allergic reactions and increased

---

[235] 11 *Del. C.* § 6536 (emphasis added).

[236] Likewise, as described above, Count III alleges retaliation for:  requesting medical treatment and explanations for his placement in the SHU, his mental illness and manifestations thereof, and providing information and assistance in a DOJ investigation. D.I. 29, Count III.  That count relates to Clark's placement in the SHU, and the duration of that placement, matters over which the Medical Defendants had no control.  *See, e.g.*, *id.* at ¶ 1 (Clark was placed in the SHU "in retaliation for [his] SMI, loud voice, or minor rule infractions . . . ."; *id.* at ¶¶ 37, 52 (same). To the extent Clark asserts Count III against the Medical Defendants, that count is dismissed.

[237] D.I. 29 at ¶¶ 116, 117.

[238] *Id.* at ¶ 62.

[239] *Id.* at ¶ 63.

hallucinations.[240]

> The only medical providers Mr. Clark encountered while in the SHU, were: (1) Montgomery, Mumford, and Johnson, who administered medicines (including Zyprexa, which caused Mr. Clark to experience pronounced hallucinations and adverse and allergic side effects, such as paralysis and intense pain in his legs) . . . ; and (2) Yunis who shouted through the glass to Mr. Clark every few months concerning his medications.;[241]

> The Medical Provider defendants continue to administer Zyprexa to Mr. Clark despite their knowledge that he is allergic to the drug and that it continues to cause significant adverse side effects;[242] and

> The deficiency in professional care resulted in further deterioration of Mr. Clark's mental health, including an increase in depression, hallucinations, and self-mutilation.[243]

Additionally, the FAC alleges Lynch and Muñoz participated in the purported deliberate indifference by "supervising the other Medical Provider defendants, advis[ing] them on their deleterious treatment of Clark, and participat[ing] in the decisions to . . . continue administering seriously harmful medications to Mr. Clark . . . ."[244] The FAC also alleges in four separate, but identical paragraphs, that Yunis, Montgomery, Mumford, and Johnson "administered and made decisions to continue administering seriously harmful medications to Mr. Clark . . . ."[245]

The Medical Defendants acknowledge the allegations that Yunis, Mumford, Montgomery, and Johnson administered medications allegedly causing harmful side

---

[240] *Id.* at ¶ 9.
[241] *Id.* at ¶ 64.
[242] *Id.* at ¶ 65.
[243] *Id.* at ¶ 66.
[244] *Id.* at ¶¶ 99, 100.
[245] *Id.* at ¶¶ 101, 102, 103, 104.

effects,[246] but maintain the uniformity of those allegations and lack of other detail demonstrate they are merely formulaic allegations that only suggest a possibility of misconduct.[247]  They contend the lack of specificity as to the timing and frequency the medications were administered, the bases for defendants' knowledge of the harm caused, or how each participated in the decision to continue to administer the medications fails to adequately support Clark's claim.[248]  They also criticize the FAC's failure to specify what medications, other than Zyprexa, caused Clark's harm.[249]

 The court disagrees with the Medical Defendants' assessment that Clark's claim with respect to the medications he received fails for lack of specificity.  The FAC identifies the individuals who administered the complained-of medications.[250]  The court does not find the uniformity of Clark's contentions problematic; each identified defendant administered the same medications that produced the same deleterious side effects.[251]  The court also does not agree with the level of specificity the Medical Defendants suggest is required with regard to when, and the frequency of, medications Clark was given.  The FAC alleges that "*[w]hile Mr. Clark was in the SHU*" the named defendants administered the allegedly harmful medications.[252]  The FAC alleges those

---

[246] D.I. 35 at 3-4, 12-13.  Although the allegation in paragraph 101 does not name Zyprexa, it specifically alleges Yunis administered "seriously harmful medications to Mr. Clark."  D.I. 29 at ¶ 101.

[247] D.I. 35 at 12.

[248] *Id.* at 12-13.

[249] *Id.* at 12.

[250] D.I. 29 at ¶¶ 101-04.

[251] *Id.* at ¶ 64.

[252] *Id.* at ¶¶ 9, 64, 101 (emphasis added).

defendants "continue to administer Zyprexa to Mr. Clark."[253]  At the pleading stage, the

court finds Clark was not required to allege the *precise dates*, i.e., when and how

frequently, he received the purportedly deleterious medications.  His allegations that

those medications were administered while he was in the SHU, and continue to be

administered, are sufficient to provide Rule 8(a) notice.  With respect to the knowledge

of Yunis, Mumford, Montgomery, and Johnson that the medications harmed Clark, the

FAC alleges the medicines administered caused pronounced hallucinations, paralysis,

and intense pain in his legs,[254] and that "Defendants with deliberate indifference ignored

Mr. Clark's need for and denied his *requests for . . . proper medication*, causing [him]

serious harm."[255]

The Medical Defendants also contend Clark's claim fails because he admits he

received treatment with Zyprexa, which is used to treat schizophrenia, and, therefore,

his complaint is over the adequacy or reasonableness of that treatment.[256]  An inmate

must receive adequate medical care, however, more than mere disagreement as to the

reasonableness of that care must be alleged; facts must be alleged that support a claim

of deliberate indifference to the adequacy of his medical care.[257]

---

[253] *Id.* at ¶ 65; *id.* at ¶¶ 101-04 (Yunis, Montgomery, Mumford, and Johnson "*made decisions* to *continue administering* seriously harmful medications to Mr. Clark . . . .") (emphasis added).  It is not fatal to Clark's claim that the FAC does not elaborate on the decision-making with regard to the continued administration of those medications, or that the FAC does not specify what medications, other than Zyprexa, caused Clark's harm.  Purportedly harmful medications continued to be given to Clark and the negative effects of Zyprexa were specified.

[254] *Id.* at ¶ 64.

[255] *Id.* at ¶ 62 (emphasis added).

[256] D.I. 35 at 10-13.

[257] *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Pearson v. Prison Health Servs.*, 850 F.3d 526, 535 (3d Cir. 2017) (citation omitted); *Rouse v. Plantier*, 182 F.3d 192,

The court first notes the FAC does not allege Zyprexa is used to treat schizophrenia, and no authority is cited to permit the court's consideration of that use on a motion to dismiss.  Other than citing cases for general standards required to allege deliberate indifference to serious medical need, the Medical Defendants do not explain how the cited cases directly apply to the FAC.  *Hudson v. McMillian* involved allegations of excessive force in which the Court reversed a judgement in favor of the plaintiff.[258] *Rouse v. Plantier* addressed class action allegations by past, present, and future insulin-dependent diabetic inmates that various corrections officials and employees were deliberately indifferent to the plaintiff's serious medical needs.[259]  The Third Circuit vacated the district court's refusal to grant summary judgment in defendants' favor on the grounds of qualified immunity and remanded for reevaluation of that issue.[260]  In *Pearson v. Prison Health Services*, a prisoner having two serious medical needs alleged certain prison officials and an independent medical contractor were deliberately indifferent to those the needs.[261]  The Third Circuit reversed and remanded a grant of summary judgment as to one of five defendants where it determined a reasonable jury could find deliberate indifference based on alleged facts concerning the examination and treatment the prisoner.[262]  *U.S. ex rel. Walker v. Fayette County* reversed and

---

197 (3d Cir. 1999) (citation omitted).

[258] 503 U.S. 1, 4 (1992) ("This case requires us to decide whether the use of excessive physical force against a prisoner may constitute cruel and unusual punishment when the inmate does not suffer serious injury.  We answer that question in the affirmative.").

[259] 182 F.3d 192, 193 (3d Cir. 1999).

[260] *Id.* at 193, 201.

[261] 850 F.3d 526, 531 (3d Cir. 2017).

[262] *Id.* at 540-42, 545.  Earlier in the litigation, the Third Circuit found plaintiff's initial *pro se* allegations sufficient to survive a motion to dismiss.  *Pearson v. Prison*

remanded the dismissal of *pro se* plaintiff's complaint that alleged "he informed the

prison authorities of his drug habit, requested medical treatment and receive no

attention for ten days and inadequate treatment thereafter, during which time he went

through a period of painful drug withdrawal.[263]  The plaintiffs in *Inmates of Allegheny*

*County v. Pierce*, brought a civil rights action seeking declaratory judgment that

conditions of confinement for pretrial detainees incarcerated in jail violated their

constitutional rights.[264]  The Third Circuit affirmed the district court's judgment, after trial,

that certain of the challenged conditions violated the constitutional rights of the inmates,

but remanded on the issue of psychiatric care.[265]  Those cases do not compel dismissal

---

*Health Serv.*, 348 Fed. App'x 722, 725 (3d Cir. 2009) (vacating grant of motion to dismiss and remanding to permit amendment of  *pro se* plaintiff's complaint before again dismissing on the basis of any further Rule 12(b)(6) motion where plaintiff's original complaint stated the elements of a deliberate indifference claim by alleging "facts raising an inference that defendants were deliberately indifferent to his suffering and delayed medical care for non-medical reasons").

[263] 599 F.2d 573, 575-76 (3d Cir. 1979); *id.* at 576 (finding where the complaint "made reference only to state law and did not allege a deprivation of rights assured by federal statutes or the Constitution . . . the district court should not immediately have dismissed the complaint under 28 U.S.C. § 1915(d) . . . [but] should have heeded the advice of the Federal Judicial Center's Prisoner Civil Rights Committee . . . [which] would have permitted the Pro se plaintiff to make the necessary formal amendment alleging a deprivation of federal rights in conformance with the liberal amendment policy followed by the court in this circuit") (citation and footnote omitted).

[264] 612 F.2d 754, 756-57 (3d Cir. 1979).

[265] *Id.* at 757, 763-64 ("The key factor in determining whether a system for psychological or psychiatric care in a jail or prison is constitutionally adequate is whether inmates with serious mental or emotional illnesses or disturbances are provided reasonable access to medical personnel qualified to diagnose and treat such illnesses or disturbances.  We hold that, when inmates with serious mental ills are effectively prevented from being diagnosed and treated by qualified professionals, the system of care does not meet the constitutional requirements set forth by [*Estelle*], and thus violates the Due Process Clause."); *Owens-El v. Robinson*, 457 F. Supp. 984 (W.D. Pa. 1978) (district court's final opinion and order in two consolidated actions issued after a six week non-jury trial during which some fifty witnesses provided testimony).

of Clark's claims relating to his prison medications.

The court does not agree that the FAC merely alleges the inadequacy or unreasonableness of his medications and finds Clark's allegations that he was, and is being, administered medication that causes him to suffer severe pronounced hallucinations, paralysis, and intense pain in his legs[266] despite his "requests for . . . proper medication,"[267] states a plausible Eight Amendment cruel and unusual punishment violation against Yunis, Mumford, Montgomery, and Johnson.

With respect to Lynch and Muñoz, however, the court finds that the FAC fails to sufficiently plead a claim of supervisor liability. The only specific allegations against those defendants is that they "advised [the other Medical Defendants] . . . on their deleterious treatment of Clark, and participated in decisions . . . to continue administering seriously harmful medications to . . . Clark."[268] Other than that bald accusation, there are no facts supporting an implication that either knew of, or acquiesced in, Clark being administered the complained-of medications and their purportedly harmful effects.

The court determines that the facts alleged in the FAC support a plausible claim that Clark's rights were violated when he was administered purportedly harmful medications and, therefore, the Medical Defendants' motion to dismiss that claim is denied as to Yunis, Mumford, Montgomery, and Johnson. The motion is granted as to Lynch and Muñoz.

---

[266] D.I. 29 at ¶ 64.
[267] *Id.* at ¶ 62.
[268] *Id.* at ¶¶ 99, 100.

Count II also alleges violations with respect to Clark's mental health treatment.

> Rather than providing Mr. Clark with the counseling he needs . . . for his SMI . . . . [the Medical Provider] defendants . . . failed to provide any counseling at all while Mr. Clark was in the SHU and provided grossly inadequate and sporadic counseling when he was not in the SHU.[269]

> The Medical Provider defendants have been aware of and are deliberately indifferent to the deprivations suffered by Mr. Clark by virtue of their prior knowledge of Mr. Clark's mental illness diagnoses, prior knowledge of the serious mental health implications of long term confinement in isolation, . . . and Mr. Clark's repeated requests for adequate treatment for his mental illness.[270]

> The Medical Provider Defendants' deliberate indifference is the proximate cause of the harm suffered by Mr. Clark, including pronounced worsening of his symptoms of hallucination, depression, and self-mutilation.[271]

The FAC alleges the following in support of those claims:

> While Mr. Clark was in the SHU, Defendants deprived Mr. Clark of any meaningful mental health treatment . . . . He was treated infrequently by a mental health provider, going weeks and months without any meaningful interaction with a medical health provider, and he had no mental health counseling.[272]

> While in the SHU, Mr. Clark had no access to therapy sessions or counseling, and he only saw a mental health provider who evaluated his medications once every few months.[273]

> Mr. Clark, like others with serious mental illness, needs psychosocial rehabilitation services, such as frequent individual and group therapy sessions, and structured out-of-cell activities designed to decrease isolation, increase social interaction, increase treatment and medication compliance, and decrease psychiatric symptoms. These services were not provided to Mr. Clark in solitary confinement.[274]

---

[269] *Id.* at ¶¶ 117, 119.
[270] *Id.* at ¶ 120.
[271] *Id.* at ¶ 121.
[272] *Id.* at ¶ 9.
[273] *Id.* at ¶ 41.
[274] *Id.* at ¶ 42.

While in the SHU, Mr. Clark repeatedly requested that he be given mental health treatment, and that he be transferred to a facility capable of providing him with treatment.[275]

The Medical Provider defendants . . . failed to give Mr. Clark any counseling for extended periods of time, despite his diagnoses of schizophrenia and manic depression.[276]

The only medical providers Mr. Clark encountered while in the SHU, were: (1) Montgomery, Mumford, and Johnson, who administered [deleterious] medicines . . . ; and (2) Yunis who shouted through the glass to Mr. Clark every few months concerning his medications.[277]

An essential element of the treatment of prisoners with mental illness is a review by mental health staff of a prisoner and his or her mental health records to determine whether the prisoner's existing mental health needs contraindicate placement in solitary confinement or require other accommodation.[278]

DOC's Policy Manual requires it to:  review a prisoner's medical record prior to or within one hour of placement in solitary confinement for mental health conditions; identify those prisoners whose conditions would be contrary to confinement in segregation, including prisoners with serious mental illness; refer immediately to mental health personnel for follow-up prisoners who have received any treatment in the past five years for serious mental illness, prior to placement in solitary confinement; conduct an assessment of the prisoner *in a private setting* within 24 hours of a mentally ill prisoner's placement in solitary confinement; and after completing the assessment, review the disciplinary charges against the prisoner and evaluate what role the prisoner's mental illness played in his or her conduct.[279]

DOC's Policy Manual also requires it to monitor prisoners in the SHU with mental illness daily and to evaluate those prisoners three times per week. Monitoring requires, at a minimum, "verbally offering the patient a sick call slip and visually observing whether the patient requires any emergent, urgent or routine health care."  Evaluation must be performed by mental health personnel, and includes, at a minimum "a face to face encounter

---

[275] *Id.* at ¶ 56.
[276] *Id.* at ¶ 63.
[277] *Id.* at ¶ 64.
[278] *Id.* at ¶ 71.
[279] *Id.* at ¶ 72 (emphasis in original).

where the clinician speaks to the patient, observes the patient's mental health condition and verifies the patient is receiving any prescribed psychotropic medication." Evaluation should also include "an assessment of potential decompensation and assessment of appropriate treatment and placement.'"[280]

Defendants failed to monitor Mr. Clark in the SHU on a daily basis in accordance with DOC's Policy Manual, and their "evaluation" of Mr. Clark fell below the minimal threshold defined in the DOC Policy Manual.[281]

Cell-front visits do not comply with the privacy standards set forth in DOC's Policy Manual, which requires that healthcare be provided "in a manner and location that promotes confidentiality" and mandate that "clinical encounters and discussions occur in private, without being observed or overheard." Nor do such visits conform to the privacy requirements of the Health Insurance Portability Accountability Act of 1996 ("HIPPA"). Such visits do not constitute meaningful mental health treatment, as DOC recognizes.[282]

The DOC defendants made deliberate decisions in conjunction with the Medical Provider defendants to deny Mr. Clark even minimum mental health care.[283]

Clark maintains he can only turn to those health care providers authorized by the State for medical care.[284] He contends where all the Medical Defendants acquiesced for a long period of time in the DOC's policy of housing SMI prisoners in the SHU and denying them mental health care, means those defendants engaged in a custom or course of conduct that denied Clark the necessary treatment for his SMI.[285] Therefore,

---

[280] *Id.* at ¶ 74.
[281] *Id.* at ¶ 75.
[282] *Id.* at ¶ 76.
[283] *Id.* at ¶ 77.
[284] D.I. 37 at 10 (citing *West v. Atkins*, 487 U.S. 42, 55 (1988) ("It is only those physicians authorized by the State to whom the inmate may turn. Under state law, the only medical care West could receive for his injury was that provided by the State.")).
[285] D.I. 37 at 10; *id.* at 10-11 (Clark asserts "[t]he FAC adequately pleads that each defendant was aware of and acquiesced in or participated in the DOC's policy of housing Clark, and many other seriously mentally ill inmates like him, in the SHU as a punishment for their SMI despite the known risk of such conduct.") (citing D.I. 29 at

not just the employees, but their supervisors, including Lynch and Muñoz, allegedly violated his constitutional rights.[286]

The court determines that, at this stage of the litigation, the facts alleged in the FAC support a plausible claim that Clark was denied adequate mental health treatment and, therefore, the Medical Defendants' motion to dismiss that claim is denied as to Yunis, Mumford, Montgomery, and Johnson, and the motion is granted as to Lynch and Muñoz.[287]

Finally, the court declines to grant leave to amend the FAC to provide an opportunity for Clark to provide more specificity in an attempt to adequately support the dismissed portions of his complaint. In opposing each motion to dismiss, Clark did not request leave to amend should the court grant any, or all, relief sought by defendants and made only passing reference to the permitted amendment in an unrelated case.[288] In making a substantive response to the Medical Defendants' reliance on *Shabazz v. Connections Cmty. Support Programs, Inc.*,[289] Clark parenthetically notes the plaintiff there was permitted to amend his complaint.[290] The *Shabazz* court noted it was inclined to grant leave to amend where the plaintiff's "First and Second Amended Complaints

---

¶¶ 4, 67). The court has found, above, the Medical Defendants played no role in the decision to place Clark in the SHU. Therefore, allegations that they acquiesced, or participated, in that decision are not credited.

[286] D.I. 37 at 10 (citing *Lamb v. Taylor*, 2009 WL 866793, at *3 (D. Del. Mar. 31, 2009)).

[287] Unlike the inadequate, unsupported, allegations against Lynch and Muñoz in connection with Clark's medical treatment, there are none whatsoever with regard to his inadequate mental health treatment.

[288] D.I. 37 at 12.

[289] C.A. No. 16-570-RGA, 2017 WL 5714000 (D. Del. Nov. 28, 2017).

[290] D.I. 37 at 12.

were nearly identical and filed barely a month apart . . . ."[291]  Here, the FAC was filed

four months after the court recognized the appointment of his current counsel and is

substantially different from his initial *pro se* complaint filed January 23, 2017.[292]

    Unlike the Clark, the *Shabazz* plaintiff formally requested leave to amend in his

opposition to the motion to dismiss should his complaint be dismissed.[293]  Also, Clark

did not seek leave to amend the FAC prior to the Scheduling Order's September 14,

2018 deadline to amend or supplement the pleadings.[294]

    Moreover, counsel for the Medical Defendants "advised Mr. Clark's counsel that

they believed the FAC was deficient, provided insight as to the deficiencies, and offered

Plaintiff an opportunity to amend the FAC before a motion to dismiss was filed.  Mr.

Clark's counsel declined this offer."[295]  Clark's opposition to the Medical Defendants'

motion to dismiss also attaches a March 20, 2018 email from Clark's counsel to

defendants' counsel stating "[w]e have carefully reviewed the FAC in light of your

concerns and do not plan to amend at this time."[296]  "[A] court 'has discretion to deny a

plaintiff leave to amend where the plaintiff was put on notice as to the deficiencies in his

complaint, but chose not to resolve them.'"[297]

    For the above reasons, the court declines to grant leave to amend the FAC.

---

[291] *Shabazz*, 2017 WL 5714000, at *3.

[292] D.I. 1.

[293] C.A. No. 16-570-RGA (D.I. 35 at 15).

[294] *See* D.I. 49 (Scheduling Order) at ¶ 2.

[295] D.I. 35 at 2 (citing *id.* at 2 n.3 (March 6, 2018 e-mail from Randall MacTough to plaintiff's counsel and March 20, 2018 e-mail from plaintiff's counsel to counsel for all of the defendants, attached as Exhibit A)).

[296] D.I. 37, Ex. 1.

[297] *Kundratic v. Thomas*, 407 F. App'x 625, 630 (3d Cir. 2011) (quoting *Krantz v. Prudential Invs. Fund Mgmt. LLC*, 305 F.3d 140, 144 (3d Cir. 2002)).

## V.    RECOMMENDED DISPOSITION

Consistent with the findings above,

IT IS RECOMMENDED that the DOC Defendants' Motion to Dismiss (D.I. 32) be

**GRANTED IN PART and DENIED IN PART** and the Medical Defendants' Motion to

Dismiss (D.I. 34) be **GRANTED IN PART and DENIED IN PART**.

Pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), FED. R. CIV. P. 72 (b), and D. DEL.

LR 72.1, any objections to this Report and Recommendation shall be filed within

fourteen (14) days limited to ten (10) pages.  Any response shall be limited to ten (10)

pages and filed within fourteen (14) days thereafter.

The parties are directed to the Court's Standing Order in Non-Pro Se Matters for

Objections Filed under FED. R. CIV. P. 72 dated October 9, 2013, a copy of which is

found on the Court's website (www.ded.uscourts.gov).


December 28, 2018                          /s/ Mary Pat Thynge
                                          Chief U.S. Magistrate Judge