**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ANGELO LEE CLARK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 17-066-RGA |
| v. | ) | |
| | ) | |
| ROBERT COUPE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**FINAL PRETRIAL ORDER**

This Order shall control the subsequent course of the action, unless modified by the Court.

## I.    STATEMENT OF THE NATURE OF THE ACTION

1.    Plaintiff Angelo Lee Clark ("Mr. Clark" or "Angelo") filed his Complaint (D.I. 1) in this matter on January 23, 2017, against several Defendants.

2.    On September 12, 2017, Barnes and Thornburg LLP was appointed counsel pursuant to the Federal Civil Panel to represent Plaintiff.  (D.I. 22).

3.    On January 12, 2019, Plaintiff filed his First Amended Complaint.  (D.I. 29.)

4.    On May 28, 2019, Plaintiff filed his Second Amended Complaint (D.I. 92), which is the operative complaint.

5.    On July 3, 2019, the DOC defendants filed an answer to the Second Amended Complaint.  D.I. 102.

6.    On February 10, 2020, the Medical Defendants were dismissed from the case.

7.    Following discovery, on October 14, 2020, the DOC defendants filed a Motion for Summary Judgment.  (D.I. 172).  On January 12, 2021, the Court heard oral argument on the DOC Defendants' Motion for Summary Judgment. On January 20, 2021, the Court denied the DOC Defendants' Motion for Summary Judgment.  (D.I. 189). Specifically, the Court denied the DOC Defendants' motion as to: Plaintiff's claim for deliberate indifference, (D.I. 189 at 3-6), and Plaintiff's retaliation claim.  (D.I. 189 at 6-8).

8.    On May 6, 2021, Mr. Clark and the DOC Defendants agreed to dismiss Perry Phelps, Bruce Burton, John Burton, Jeffrey Carrothers, Marcelo Rispoli and Roland Willey.  The remaining DOC Defendants are David Pierce and Robert M. Coupe, (the "DOC Defendants").

9.    On November 9, 2020, the DOC Defendants and Plaintiff stipulated and agreed to dismissal of Count IV of Plaintiff's Second Amended Complaint. (D.I. 178). The Court granted

the stipulation and dismissed Count IV of Plaintiff's Second Amended Complaint against the DOC Defendants. (D.I. 179).

     10.    Mr. Clark's remaining § 1983 claims are as follows:

        a.    Defendants Coupe and Pierce violated Mr. Clark's Eighth Amendment rights by placing him in the solitary confinement because of his mental illness.

        b.    Defendants Coupe and Pierce violated Mr. Clark's Eighth Amendment rights through their deliberate indifference to Mr. Clark's medical needs.

     11.    [Deleted].

## II.   FEDERAL JURISDICTION

     12.    This Court has jurisdiction over these claims pursuant to 28 U.S.C. § 1331. The jurisdiction of this Court is not disputed.

## III.   STATEMENT OF FACTS THAT ARE ADMITTED AND REQUIRE NO PROOF

### Joint Statement of Facts that are Admitted and Require No Proof

     13.    At all relevant times in 2015 and 2016, Angelo Lee Clark ("Mr. Clark") was an inmate housed at James T. Vaughn Correctional Center ("JTVCC").

     14.    At all relevant times in 2016, Defendant Pierce was the Warden of JTVCC and an employee of the Delaware Department of Correction.

     15.    At all relevant times in 2016, Defendant Robert Coupe was the Commissioner of the Delaware Department of Correction.

     16.    JTVCC is a prison in Smyrna, Delaware operated by the Delaware Department of Correction (the "DOC").

     17.    At all relevant times in 2016, Defendants Pierce and Coupe were acting under the color of state law.

     18.    In 2015 and 2016, Mr. Clark had been diagnosed as having a serious mental illness.

19.     At all relevant times in 2015 and 2016, Mr. Clark was on a roster of "SMI" inmates—those with Severe Mental Illness.

20.     In 2016, Mr. Clark was housed in JTVCC's Segregated Housing Unit (the "SHU") for approximately seven months.

21.     In August 2019, Mr. Clark was transferred to the Delaware Psychiatric Center.

22.     Mr. Clark is no longer in DOC custody.

## IV.    ISSUES OF FACT REMAINING TO BE LITIGATED

23.     Plaintiff's list of factual issues remaining to be litigated is attached[1] as **Exhibit 1**.

24.     DOC Defendants' list of factual issues remaining to be litigated is attached as **Exhibit 2**.

## V.    STATEMENT OF ISSUES OF LAW REMAINING TO BE LITIGATED

25.     Plaintiff's statement of the issues of law that remain to be litigated are below:

### Angelo Lee Clark's Issues of Law Remaining to Be Litigated

26.     Has Mr. Clark shown by a preponderance of the evidence that the DOC Defendants violated his Eighth Amendment rights by placing and keeping him in the solitary confinement because of his mental illness.  *See, e.g., Robinson v. California*, 370 U.S. 660, 667 (1962); D.I. 90 at 5 ("There is no dispute that if a mentally ill inmate is placed in solitary confinement because of his mental illness, his clearly established right not to be punished for a disease has been violated."); *id*. ("Thus, I will allow Mr. Clark to proceed with his Eighth Amendment claim on the theory that his Eighth Amendment rights were violated by Defendants placing him in the solitary housing unit because of his mental illness."); D.I. 69 at 21 ("[e]xisting law clearly establishes that housing mentally ill prisoners in solitary violates the Eighth Amendment and the ADA, and that a prisoner

---

[1] The Exhibits are attached to the Proposed Final Pretrial Order.  (D.I. 200).

cannot be punished for an illness or deprived of medical care," conflating his clearly-established-law arguments with regard to housing mentally ill inmates in the SHU, punishment for illness, and deprivation of medical care.  *Id.* at 13 (citing *Estelle*, 429 U.S. at 109; *Robinson*, 370 U.S. at 666-68; *Gomez*, 889 F. Supp. at 1266-67).").; D.I. 69 at 38 ("Punishment for being mentally is a constitutional violation."); Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.

27.     Has Mr. Clark shown by a preponderance of the evidence that the DOC Defendants violated Mr. Clark's Eighth Amendment rights through their deliberate indifference to Mr. Clark's medical needs.  *Farmer v. Brennan*, 511 U.S. 825, 842 (1994); *Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) (quoting *White v. Napoleon*, 897 F.2d 103, 108-09 (3d Cir. 1990)) (internal quotations omitted); *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976); *Palakovic v. Wetzel*, 854 F.3d 209, 227-28 (3d Cir. 2017); *West v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978); *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003); *Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977) (noting "no underlying distinction between the right to medical care for physical ills and its psychological or psychiatric counterpart"); *Madrid v. Gomez*, 889 F. Supp., 1146, 1259 (N.D. Cal. 1995) (prison officials violate the Eighth Amendment "by virtue of their utter failure to provide for adequate medical and mental health" to SMI prisoners in solitary confinement); Kedra v. Schroeter, 876 F.3d 424, 445 (3d Cir. 2017); *Simmons v. Philadelphia*, 947 F.2d 1042, 1059 (3d Cir. 1991); 28 C.F.R. § 35.152 (b)(2)(iii) (prohibiting placing "inmates or detainees with disabilities in facilities" with programs inferior to "facilities where they would otherwise be housed").

28.     DOC Defendants' statement of the issues of law that remain to be litigated are below:

**Mr. Coupe and Mr. Pierce's Issues of Law Remaining to Be Litigated**

29.     Plaintiff and the DOC Defendants have pending motions *in limine* to which the opposing parties have responded.

30.     Whether Mr. Clark was placed in the SHU because of his status as a mentally ill inmate or because he attacked another inmate.  *U.S. v. MacEwan*, 445 F.3d 237, 249 n.11 (3d Cir. 2006) (rejecting attempt to cast punishment for repeatedly violating federal laws prohibiting receipt of child pornography as a punishment for an addiction in violation of *Robinson v. California*, 370 U.S. 660, 666-67 (1962); *see United States v. Pena*, 125 F.3d 285, 287-88 (5th Cir. 1997) (concluding that the statute at issue is not unreasonable where it punishes the violation of probation for using narcotics, not the defendant's addiction to narcotics.).

31.     Whether the law distinguishes between punishing an individual because of his status and punishing an individual because of his actions, even if those actions may relate in some way to his status.  *U.S. v. MacEwan*, 445 F.3d 237, 249 n.11 (3d Cir. 2006) (rejecting attempt to cast punishment for repeatedly violating federal laws prohibiting receipt of child pornography as a punishment for an addiction in violation of *Robinson v. California*, 370 U.S. 660, 666-67 (1962); *see United States v. Pena*, 125 F.3d 285, 287-88 (5th Cir. 1997) (concluding that the statute at issue is not unreasonable where it punishes the violation of probation for using narcotics, not the defendant's addiction to narcotics.).

32.     Whether the DOC Defendants violated Mr. Clark's Eighth Amendment rights if neither of them made the decision to place Mr. Clark in the SHU.  D.I. 82 at 3 (quoting *Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007) ("A defendant in a civil rights action must have personal involvement in the alleged wrongs to be liable and cannot be held responsible for a constitutional violation which he or she neither participated in nor approved.").

33.     Whether Defendant Coupe could have violated Mr. Clark's Eighth Amendment rights if he did not know that Mr. Clark had a serious medical illness or that he was placed in the SHU.  D.I. 189 at 3 (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

34.     Whether Defendants Coupe or Pierce had knowledge that Mr. Clark required medical care and was not receiving that care or being mistreated by the medical providers.  *Spruill v. Gillis*, 373 F.3d 218, 236 (3d Cir. 2004); *see Breen v. Coleman*, 575 F.App'x 44, 48 (3d Cir. 2014) ("Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."); *see* D.I. 82 (quoting *Pearson v. Prison Health Serv.*, 348 F. App'x 722, 725 (3d Cir. 2009) (deliberate indifference standard may be satisfied "when a prison official knows of a prisoner's need for medical treatment but intentionally refuses to provide it or delays necessary medical treatment based on a nonmedical reason."); *Estate of Thomas v. Fayette Cnty.*, 194 F.Supp 3d 358, 362 (W.D. Pa. 2016).

35.     [Deleted].

36.     [Deleted].

37.     Whether, given the difficulty of the task of prison officials, any relevant decisions made by Defendants Coupe or Pierce are entitled to deference, particularly where prison security is concerned.  *Weber v. Little*, 2021 WL 810362 at *7 (D.Del. Mar. 3, 2021)

38.     Whether Defendants Coupe and/or Pierce are entitled to the defense of qualified immunity.  *Wright v. City of Philadelphia*, 409 F.3d 595, 599 (3d. Cir. 2005); *see Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (recognizing that qualified immunity protects government officials from liability for civil damage unless (1) the official's conduct violated a constitutional right or statutory right; and (2) that violated right was "clearly established.").

39.     Whether Defendants Coupe and/or Pierce are entitled to the defense of sovereign immunity.  *Alden v. Maine*, 527 U.S. 706, 713 (1999) (recognizing that the immunity of states and their officials "from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today except as altered by the plan of the Convention or certain constitutional Amendments."); *see also Waterfront Commission on New York Harbor v. Governor of New Jersey*, 961 F.3d 234, 238 (3d Cir. 2020) ("State sovereign immunity dates back to our Nation's Founding, and is deeply rooted in English law. Assurances that State would remain immune from federal suit – absent their consent – were instrumental in securing sufficient support for the Constitution's adoption."); *Williams v. Connolly*, 734 Fed. App'x 813, 816 (3d Cir. 2018) (citing *Christ the King Manor, Inc. v. Sec'y U.S. Dep't. of Health & Human Servs.*, 730 F.3d 291, 318 (3d Cir. 2013)) (recognizing that a plaintiff may only sue a state official "for prospective injunctive relief to end ongoing violations of federal law.").

40.     Whether Mr. Clark's claims against Defendants Coupe and Pierce are barred because Mr. Clark failed to exhaust his administrative remedies.  42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."); *Woodford v. Ngo*, 548 U.S. 81, 88 (2006) (exhaustion means "proper exhaustion," that is, "a prisoner must complete the administrative review process in accordance with the applicable procedural rules, **including deadlines**, as a precondition to bringing suit in federal court."); *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (recognizing the PLRA's exhaustion requirement applies to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."); *Jetter v. Beard*, 183 F. App'x 178 (3d Cir. 2006) (holding an inmate is barred from

subsequently litigating in federal court after failing to fully or timely exhaust administrative remedies); *Ahmed v. Dragovich*, 297 F.3d 201, 209 n.9 (3d Cir. 2002) (recognizing it is well-settled that a plaintiff inmate must exhaust his administrative remedies before filing a civil rights suit); *Newman v. Johnson*, 2014 WL 6810702, at *3 (D. Del. Dec. 3, 2014).  Failure to exhaust administrative remedies is not an issue to be presented to the jury.

41.     Whether Defendants Coupe and/or Pierce, as former state officials being sued in their official capacities, are "persons" capable of being sued for civil rights violations under section 1983.  *Baquero v. Mendoza*, 828 F. App'x 137, 140 (3d Cir. 2020) (citation omitted).

42.     Whether Defendant Coupe or Defendant Pierce had any personal involvement in the matters that are the subject of Mr. Clark's claims. D.I. 82 at 3 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (recognizing that in a § 1983 suit the plaintiff must show "that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); <u>*Blizzard v. Commander, Del. State Police Troop Nine*</u>, 725 F. Supp. 2d 469, 473 (D. Del. 2010) ("defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of *respondeat superior.*")

43.     Whether, to the extent Mr. Clark is still pursuing a claim for injunctive relief, that request for injunctive or any other prospective relief has been mooted by Mr. Clark's release from DOC custody and the DOC Defendants having left the DOC.  Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies."  *Lewis v. Con't Bank Corp.*, 494 U.S. 472, 477 (1990).  The mootness doctrine thus requires "that a litigant maintain standing to prosecute his or her lawsuit throughout the duration of the litigation."  *Democracy Rising PA v. Celluci*, 603 F.Supp.2d 780, 793 (M.D. Pa. 2009) (citations omitted); *see Arizonans for Official English v Arizona*, 520 U.S. 43, 67 (1997) (explaining an "actual controversy must be

extant at all stages of review"); *Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974) (same). "If at any point a claim ceases to 'present[] a live case or controversy, the claim is moot and the federal court lacks jurisdiction to hear it.'" *Id.* (quoting *Nextel West Corp. v. Unity Twp.*, 282 F.3d 257, 261 (3d. Cir. 2002)); *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (explaining a case is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome"); *see Golden v. Zwickler*, 394 U.S. 103, 109 (1969) ("The power of courts . . . arises only when the interests of litigants require the use of this judicial authority for their protection against actual interference. A hypothetical threat is not enough.") (quoting *United Public Workers of American (C.I.O.) v. Mitchell*, 330 U.S. 75, 89-90 (1947)).

## VI.   EXHIBITS

44.     The parties will offer as exhibits at trial one or more of the exhibits set forth in their respective trial exhibit lists.  These exhibit lists may include exhibits that may not necessarily be introduced into evidence.  Except for documents used solely for impeachment, a party may not offer substantive documentary evidence not appearing on its exhibit list or the exhibit list of the other party, unless the Court determines that the interest of justice so warrants.  These lists include the exhibit number to be used at trial, and a description sufficient to identify the exhibit to the other party, such as a production number or otherwise.  Any descriptions included in the exhibit lists are provided as a convenience only and shall not be used as an admission or as evidence.  The parties reserve the right to withdraw exhibits from their exhibit lists based on rulings from the Court.

45.     Plaintiff's list of exhibits and DOC Defendants' objections are attached hereto as **Exhibit 3**.

46.     DOC Defendants' list of exhibits and Plaintiff's objections are attached hereto as **Exhibit 4**.

47.     Each party reserves the right to offer an exhibit designated by the other party, even if not introduced by the designating party.  If the non-designating party offers into evidence an exhibit designated but not introduced by the designating party, the designating party reserves its right to object to the introduction into evidence of that exhibit, depending on the use for which it is being offered.

48.     The parties agree that exhibits to be used or offered into evidence solely for impeachment need not be included on the lists of trial exhibits.  The parties agree that exhibits to be used or offered into evidence solely for cross-examination or impeachment need not be disclosed in advance of being offered at trial but that exhibits being used or offered into evidence solely for non-impeachment purposes need to be included on the lists of trial exhibits.  Any document that on its face appears to have been authored by an employee, officer, or agent of a party deposed in this case shall be deemed prima facie evidence of authenticity, subject to the right of the party against whom such document is offered to adduce evidence to the contrary or to require that the offering party provide authenticating evidence if the party opposing the offer has a reasonable basis to believe the document is not authentic.

49.     The parties agree that written answers to interrogatories agreed to in this case shall be treated as having been given under oath, whether or not the answers were signed or verified by the party making them.

50.     The listing of a document on a party's exhibit list is not an admission that such document is relevant or admissible when offered by the opposing party for the purpose that the opposing party wished to admit the documents.  Each party reserves the right to object to the relevance or admissibility of any evidence offered by the other party at the time such evidence is offered in view of the specific context in which such evidence is offered.

10

**Exhibits and Demonstratives for Opening Statements**

51.     The parties agree that their respective demonstratives to be used at trial will be made available for inspection by the opposing party by 2:30 p.m. the day before the demonstrative will be used at trial.

52.     [Deleted].

**Trial Exhibits for Direct Examination**

53.     Mr. Clark will identify the witnesses he plans to call and the order in which he plans to call them by noon the day before the start of the trial.  Clark will identify exhibits to be used in connection with each direct examination (either live or by deposition) by noon the day the start of trial on a witness-by-witness basis.

54.     Defendants will identify the witnesses they plan to call and the order in which they plan to call them by 6 p.m. on the first day of trial.

55.     [Deleted].

**Demonstratives for Direct Examination**

56.     A party will provide demonstratives to be used in connection with each direct examination before the witness takes the stand, on a witness-by-witness basis.  The notice provision of this paragraph does not apply to demonstrative exhibits created in the courtroom during trial testimony or the enlargement, highlighting, ballooning, or other annotations of trial exhibits, testimony or designated deposition testimony.

**VII.    WITNESSES**

57.     Plaintiff's list of witnesses to be called live or by deposition:

    a.  Dr. Dean Aufderheide – Deposition

    b.  Robert M. Coupe – Live and/or Deposition

    c.  Dr. Stuart E. Grassian – Live

    d.  Dr. Aileen D. Fink – Live or Deposition

    e.  Rhonda L. Montgomery – Live or Deposition

    f.  David Pierce – Live and/or Deposition

    g.  Lezley Sexton – Live or Deposition

    h.  Stephanie I. Streets – Live or Deposition

    i.  Shane Troxler – Live or Deposition

58.  DOC Defendants' witnesses:

    a.  Angelo Clark (called adversely)

    b.  Robert Coupe

    c.  David Pierce

    d.  Dr. Aileen D. Fink

    e.  Lezley Sexton

    f.  Rhonda L. Montgomery

    g.  Stephanie I. Streets

    h.  Shane Troxler

59.  Defendants must respond to Plaintiff's list of deposition designations by no later than COB May 19, 2021.  Failure to make objections and to propose counter-designations will constitute a waiver.  By making objections or proposing counter-designations, Defendants do not waive the right to object on the basis that the witness is not shown to be unavailable.

60.  Each of the parties may call such rebuttal witnesses as may be necessary, so long as they were disclosed in the pretrial order.

61.  The listing of a witness on a party's witness list does not require that party to call that witness to testify, either live or by deposition.

62.     The order of witnesses on a party's witness list does not require that party to call witnesses in a particular order.  Each party may call witnesses in any order.

63.     The pretrial order as supplemented by the process described in ¶ 59 contains the maximum universe of deposition designations, counter-designations, and objections to admission of deposition testimony; none of the foregoing shall be supplemented without approval of all parties or leave of the Court, on good cause shown.  Counsel shall confer prior to trial to determine what testimony will be offered by deposition. If there are objections that remain to be resolved, the party calling the witness by deposition shall, no later than two (2) calendar days before the witness is to be called at trial, submit, on behalf of all parties: (i) A copy of the entire deposition testimony of the witness at issue, clearly highlighting the designations, counter-designations, and pending objections; and (ii) a cover letter clearly identifying the pending objections as well as a brief indication (i.e., no more than one sentence per objection) of the basis for the objection and the offering party's response to it.  Failure to comply with these procedures, absent an agreement by the parties and approval by the Court, will result in waiver of the use of the deposition testimony or waiver of objection to the use of the deposition testimony. All irrelevant and redundant material, including colloquy between counsel and objections, will be eliminated when the deposition is read or viewed at trial. The parties will be charged for all time that elapses from the time the witness is called until the next witness is called, according to the proportions to be provided by the parties.

64.     [Deleted].

## VIII.  PLAINTIFF'S STATEMENT OF INTENDED PROOF AND DETAILS OF DAMAGES CLAIMED AND OTHER RELIEF SOUGHT

65.    By way of summary, Plaintiff intends to prove the following at trial through the witnesses on his trial witness list and the documents and other materials in his trial exhibit list.

66.    Angelo Lee Clark has severe mental illness.  He was an inmate at James T. Vaughn Correction Center in Smyrna ("JTVCC") for many years.  Delaware Department of Correction ("DOC" or "Delaware DOC") doctors, or their subcontractors, diagnosed him at various times with schizoaffective disorder, antisocial personality disorder, bi-polar disorder, and various substance abuse disorders in remission.  Defendants knew of Angelo's severe mental illness and placed him on the official roster of "SMI" inmates—Severe Mental Illness.

67.    Near the end of 2015, doctors at JTVCC were changing Angelo's psychotropic medications and having problems finding a regimen that worked without significant side effects. This left Angelo in an altered state—he was hearing voices, agitated, and paranoid.  Angelo heard a voice telling him that another inmate was threatening him, and he punched that inmate.  Angelo was immediately thrown into solitary confinement, also called the "hole" or, more formally, "segregation" or the Segregated Housing Unit ("SHU").

68.    Defendants knew Angelo's severe mental illness caused him to throw this punch. The "Mental Health Review of Disciplinary Charges" given to Defendants the next day noted Angelo's "Schizophrenia" diagnosis and "extensive" mental health history, assessed the situation as "Psychosis," stated that Angelo had "recent medication changes," and plainly told Defendants the "Reason for placement in Segregation" was "not getting his meds [and] states he is hearing voices."

69.     Despite knowing that Angelo's severe mental illness was the reason he was thrown in solitary confinement, Defendants kept him there—for seven months.  Angelo—and even his nurses—repeatedly begged for him to be let out.  To no avail.

70.     The conditions in solitary were unimaginably horrible.  A small, 90-square-foot cell.  Food delivered through a small, steel slot.  Bright lights on for all but six hours a day.  One hour of out-of-cell time three times a week.  Of that one hour, 45 minutes for recreation in a caged indoor area, alone, and 15 minutes for a shower.  No time outside.  No opportunity to talk to anyone.  No meaningful psychological treatment.

71.     Dr. Stuart Grassian, a preeminent expert in the effect of solitary confinement and the only expert witness in this case, will testify that these conditions were unusually harsh in comparison with the many prisons he has evaluated.  He also will describe Angelo's treatment as the mental equivalent of putting an asthmatic in a place with little air to breathe.

72.     Defendants knew the conditions were horrible, knew they would prevent him from receiving any meaningful mental health treatment and would ruin Angelo.  Publications from the American Correction Association ("ACA")—in Defendants' files—detailed the many harms that solitary confinement causes in seriously mentally ill inmates:  suicide, cutting, increased psychotic episodes, hearing voices, decompensation.  Commissioner Coupe knew the head of Colorado prisons, Rick Raemisch, and had studied his February 20, 2014 op-ed in the New York Times about spending just 20 hours in solitary.  Mr. Raemisch described his stay:  "I felt as if I'd been there for days. I sat with my mind. How long would it take before Ad Seg chipped that away? I don't know, but I'm confident that it would be a battle I would lose."  If Mr. Raemisch, a man with no mental illness, felt that way after 20 hours, imagine how Angelo Clark, a man with serious mental illness, felt after 4,992 hours.

15

73.     In September 2015, long before Angelo's seven-month solitary confinement, CLASI sued the Delaware DOC and detailed the continuing constitutional problems:   no meaningful mental health treatment, not enough mental healthcare staff, rampant use of solitary confinement on seriously mentally ill prisoners.   Most of the Defendants here were defendants in the CLASI suit—they were fully aware.

74.     Then in late 2015, just before Angelo's seven-month solitary stay, the American Correction Association ("ACA") performed an audit on the Delaware prisons that detailed many failings with regard to mentally ill prisoners.   The report noted that "the [DOC] does not have defined levels of care to provide access to necessary treatment in accordance with the inmates/detainees assessed mental health needs."   The report also reiterated what Defendants already knew about the harms of solitary confinement on the mentally ill:

> There is a general consensus among clinicians that the conditions and duration of confinement in administrative segregation [solitary] are associated with potential psychological harm for many inmates with serious mental illness. Without access to necessary mental health care, some inmates may experience symptoms of depression, paranoia, perceptual distortions, delusional thinking, impaired problem solving ability and problems with impulse control.   In other words, the harsher the conditions and the longer the duration of confinement, the more likely deterioration may occur, or at least be resistant to improvement.

75.     Despite knowing that what they were doing was wrong, Defendants refused to stop. The ACA's audit report said Warden Pierce resisted changing the way mentally ill inmates were treated and "[i]n several instances he alluded to the 'Delaware Code' that allowed him to over-ride decisions on classification and/or mentally ill treatment issues."   Dr. Aufderheide, one of the auditors, testified that, of the "hundreds of prisons" and "many segregation units" he has been to across the United States, he had "never" seen the level of "draconian" "authoritarian[ism]" exhibited by Defendant Warden Pierce at JTVCC.

76.     Defendants recklessly and callously disregarded the certain harm to Angelo, holding him in solitary confinement for 208 days.  The only reason Defendants let Angelo out of solitary confinement in August 2016 was the pending settlement of the CLASI lawsuit, which would require the release of all SMI inmates from solitary confinement.  There is no excuse for Defendants' actions.

77.     Angelo's stay in solitary has its expected effect—it ruined him.  Dr. Grassian will testify that it precipitated or at the very least exacerbated his psychotic symptoms.  Warden Pierce himself testified that the Angelo that arrived at JTVCC was a very different man from the Angelo that Warden Pierce knew after seven months in solitary confinement.

78.     [Deleted].

79.     In addition to compensatory and punitive damages, if Mr. Clark prevails, he intends to seek an award of attorneys' fees and costs under § 1988 and other applicable authority based on a lodestar calculation.  Fees and costs are not an issue to be presented to the jury.

## IX.     STATEMENT OF WHAT DOC DEFENDANTS INTEND TO PROVE AS DEFENSES

80.     Below is a brief statement of what the DOC Defendants intend to prove as part of their defenses:

81.     The DOC Defendants will show that Plaintiff cannot succeed on Count I of his Second Amended Complaint because neither Defendant Coupe nor Defendant Pierce violated Mr. Clark's Eight Amendment Right to be free from cruel or unusual punishment when he was placed in the SHU in January 2016.  Mr. Clark was not placed in the SHU because of his status as a mentally ill inmate, but because he repeatedly punched another inmate in the back of the head and thus posed a risk to the security of the institution while he remained in the general population.  The

decision to place Mr. Clark in the SHU was made by a disciplinary hearing officer after a hearing. That officer is not a named defendant in this case.

82.     Defendants Coupe and Pierce will also show that not one of them was deliberately indifferent to any serious medical need of Mr. Clark.  Mr. Clark was in the care of medical experts at all relevant times and the DOC Defendants, as non-medical prison officials, lacked knowledge or any reasonable basis to believe that Mr. Clark was being mistreated (or not treated) by the medical professionals.

83.     There are no claims relating to Mr. Clark's First or Fifth Amendment rights.

84.     The DOC Defendants deny that Mr. Clark is entitled to compensatory damages under the facts of this case and applicable case law.  To the extent Mr. Clark were found to show he was entitled to compensatory damages, the amount demanded vastly exceeds that awarded in any other relevant case alleging wrongful confinement and is arbitrary and excessive.

85.     The DOC Defendants deny that nominal damages are appropriate.

86.     The DOC Defendants deny that punitive damages are appropriate.

87.     The DOC Defendants deny that Plaintiff's counsel are entitled to attorneys' fees. To the extent Mr. Clark were to prevail at trial and his appointed counsel were to seek fees, any fee award would be limited by, among other things, the Prison Litigation Reform Act, which "significantly limits the amount of recoverable attorney fees that a court may award a prisoner recovering a monetary judgment in a civil rights action . . . ."  *Collins v. Chandler*, 2009 WL 3459454 at *1 (D.Del. Oct. 28, 2009).

## X.     AMENDMENTS TO THE PLEADINGS

88.     Each side reserves the right to amend its pleadings to conform to proof.

## XI.     GOOD FAITH EFFORT TO RESOLVE BY SETTLEMENT

89.     The attorneys for the parties hereby certify that the parties have engaged in a good faith effort to explore the resolution of the controversy by settlement.

## XII.   MOTIONS IN LIMINE

90.     Mr. Clark's Motions in Limine, Defendants' Responses, and Mr. Clark's replies are attached as **Exhibit 6.**  They are separately resolved.

91.     Defendants' Motions in Limine, Mr. Clark's Responses, and Defendants' replies are attached as **Exhibit 7.**  They are separately resolved.

## XIII.   OTHER ITEMS

92.     This case is scheduled for an eight-hour per side (that is, for openings, direct exams, and cross-exams, but not including closing argument) jury trial beginning on June 7, 2021, with jury selection to take place on the first day of trial.

93.     There shall be eight jurors.  The Court will conduct jury selection through the "struck juror" method, beginning with the Court reading voir dire to the jury panel in the courtroom, continuing by meeting with jurors individually in Chambers or at sidebar and there addressing any challenges for cause, and concluding with peremptory strikes. Jury trial days generally run from 9:30 a.m. to 5:00 p.m. with two 15-minute breaks (morning and afternoon) and a lunch break.  **THE ATTORNEYS ARE TO BE PRESENT AT 9 A.M. EACH DAY READY TO DISCUSS ANY EVIDENTIARY ISSUES OR ANY OTHER RELEVANT MATTERS.**

94.     The parties agree that the jurors shall be permitted to write notes by hand on their notepads during the trial, and that jurors be permitted to bring their notepads into the deliberation room.  The parties further propose that the jurors' notes be collected by the clerk each evening after daily recess, and collected and destroyed without review after the jury's discharge.

95.     On the first day of trial, each party shall provide a completed AO Form 187 exhibit list to the Courtroom Deputy.  All exhibits shall be pre-marked and include the prefix PTX, DTX, or JTX, the exhibit number, as well as the Civil Action Number.

96.     The parties agree that demonstrative exhibits may be admitted subject to the Federal Rules of Evidence.

97.     The parties request that the Court grant them access to the Courtroom on June 4, 2021, one business day before trial begins, to allow them to set up electronic and computer devices to be used during the trial.  The parties are to work this out with the Courtroom Deputy.

98.     The jury trial will be timed as noted in ¶ 92.  Unless otherwise ordered, time will be charged to a party for its opening statement, direct and redirect examinations of witnesses it calls, cross-examination of witnesses called by the other party, deposition designations as agreed-to above, and closing argument.  Time will not be charged for jury voir dire.  The Courtroom Deputy will keep a running total of trial time used by counsel.

99.     Presentation of evidence will follow the burden of proof.  Plaintiff will go first and present his case-in-chief.  The DOC Defendants will then present their response to Plaintiff's case-in-chief.  Plaintiff will then present his rebuttal in support of his case-in-chief.

100.     The parties stipulate that the following will not be disclosed to the jury or otherwise introduced as evidence or argument:  Mr. Clark's time in the SHU, except for the period between January 22, 2016 and August 18, 2016.

101.     The parties agree that they will not mention that Connections or any of its current or former employees settled with Mr. Clark.  Mr. Clark seeks to exclude any mention that Connections or any of its current or former employees were parties to this case or were dismissed

from this case as irrelevant, prejudicial, and extremely confusing to the jury.  DOC Defendants disagree.  The Court ruled in favor of Plaintiff on this point.

102.    The parties agree that the wealth of the defendants will not be included in the jury instructions as a factor relevant to punitive damages.  The parties further agree not to introduce evidence of the Defendants' wealth, their ability or inability to satisfy any judgment, or the fact that the State of Delaware is indemnifying Defendants.

103.    Pursuant to Federal Rule of Evidence 615, fact witnesses, other than witnesses who have already testified and been excused, shall be sequestered and prevented from hearing the testimony of other witnesses or opening statements.  Mr. Clark's expert witness, Dr. Stuart Grassian, shall also be sequestered.

104.    This pretrial order may be modified at trial of the action, or prior thereto, to prevent manifest injustice or for good cause shown.  Such modification may be made either on application of the parties or on motion of the Court.

105.    Defendants anticipate making a motion pursuant to Federal Rule of Civil Procedure 50 at the end of Plaintiff's case in chief.

## XIV.    OTHER ITEMS TO BE ADDRESSED AT THE PRETRIAL CONFERENCE

106.    Because of Mr. Clark's failing health, there is a possibility that he will not be able to attend the entire trial, although he hopes to attend the entire trial.  Mr. Clark requests that he be excused from attending trial if, in consultation with his health care providers, he is not able.  The Court grants this request, with the understanding that Mr. Clark will have to testify if he is called as a witness.

107.    [Deleted].

108.    Both parties reserve the right to redact trial exhibits to remove references to evidence that the Court excludes.  For instance, if the Court excludes evidence of Mr. Clark's convictions, references to those convictions in the exhibits will need to be removed.

109.    Mr. Clark requested that the Court declare the Connections witnesses (Sexton, Streets, and Montgomery) as hostile so that Mr. Clark's counsel could use leading questions with these witnesses.  Mr. Clark believes these witnesses should be declared hostile at least because they are former defendants.  Defendants disagreed.  The Court agrees with Defendants.

110.    [Deleted].

**IT IS HEREBY ORDERED** that this Final Pretrial Order shall control the subsequent course of the action, unless modified by the Court.

Dated:  May 17, 2021

/s/ Richard G. Andrews_____
Honorable Richard G. Andrews
U.S. District Court Judge